[Nos. C008318, C008701. Third Dist. Dec. 26, 1991.]

SIEGFRIED ENGELMANN, Plaintiff and Respondent, v.
STATE BOARD OF EDUCATION et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

## Counsel

Joseph R. Symkowick, Roger D. Wolfertz and Allan H. Keown for Defendants and Appellants.

Jay-Allen Eisen, Ann Perrin Farina and Paul Nicholas Boylan for Plaintiff and Respondent.

## Opinion

**SPARKS, Acting P. J.—**

### Introduction

In this case we face a variation on the recurrent theme of executive agencies seeking to implement "house rules" unfettered by any outside constraints—rules sometimes called "underground regulations." (See *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 205 [149 Cal.Rptr. 1, 583 P.2d 744]; *Grier* v. *Kizer* (1990) 219 Cal.App.3d 422, 440 [268 Cal.Rptr. 244].) Article IX, section 7.5 of the California Constitution succinctly provides that "The State Board of Education [Board] shall adopt textbooks for use in grades one through eight throughout the State, to be furnished without cost as provided by statute." The central question in this case is whether this delegation of constitutional authority to the Board renders all its rules and procedures for adopting textbooks[1] beyond the reach of the Administrative Procedure Act (APA). (See Gov. Code, § 11370; Stats. 1980, ch. 204, § 7, p. 434.)[2] The trial court ruled that it did not. We agree and shall hold that short of its power to make the ultimate selection among textbooks, the Board is no different than any other executive agency, and thus the governing procedures and criteria it develops for the purpose of selecting textbooks must comply with the APA. Accordingly, we shall affirm.

### Precis

Siegfried Engelmann, promulgator of DISTAR (a program of instructional materials for reading courses in elementary school classes up to the sixth grade), petitioned for a writ of mandate and declaratory relief. He asserted

---

[1] Although the statutes (Ed. Code, § 60000 et seq.) refer to "instructional materials," which cuts a broader swath definitionally (see Ed. Code, § 60011), we will use the shorthand reference "textbooks" in harmony with the constitutional provision.

[2] Government Code section 11370 provides in part: "Chapter 3.5 (commencing with Section 11340), Chapter 4 (commencing with Section 11370) and Chapter 5 (commencing with Section 11500) constitute, and may be cited as, the Administrative Procedure Act."

the procedures and criteria under which DISTAR was evaluated and found wanting in 1988 are contained in regulations which are void for failure to comply with the APA. He also asserted the Board had failed to consider the extent to which reading materials could be shown to be effective through objective tests (so-called "learner verification" data). The trial court agreed that these procedures and criteria were regulations under the APA's definition (Gov. Code, § 11342, subd. (b)) and were void since they had not been promulgated in accordance with the APA. The court therefore issued a writ of mandate commanding the Board to refrain from using those procedures and criteria until they had been promulgated as prescribed by the APA. The court also directed the Board to develop regulations for the development of learner verification plans. The trial court subsequently awarded $52,436.15 in attorney fees to plaintiff.

In the aspects of its appeal which we resolve in the published portion of this opinion, the Board[3] sserts its constitutionally delegated authority to select textbooks is not subject to the APA, either because (a) the APA by its own terms does not apply to such authority, (b) the Education Code exempts it from the APA, or (c) if the APA is applicable, it violates the doctrine of separation of powers. We find the Board's spring of constitutional power to be limited to the ultimate selection among texts, the APA to be squarely applicable to the Board's development of procedures and criteria leading up to that point, and the state Constitution to pose no barrier to enforcement of the APA.

In the unpublished portion of the opinion, we resolve the Board's uncertainties as to two aspects of the judgment and reject its challenges to the award of attorney fees. We shall therefore affirm the judgment in its entirety.

FACTS

To quote the Board's brief, "Although [the Board] filed an answer challenging some of the factual assertions of the petition . . . , the issues debated in the [trial] briefs and at the hearing, discussed in the trial court's Statement of Decision, [and] resolved in the judgment and writ were all legal questions. The essential facts were and are not disputed." We thus draw our facts from the allegations of the petition as supplemented without objection on appeal.

---

[3]There are actually three defendants in this case: the Board, the California Department of Education (the Department), and the Curriculum Development and Supplemental Materials Commission (the Commission). For convenience, we shall generally refer only to the Board, as there is no divergence of interests.

To place this case in context, we begin with a broad overview of the textbook approval process. "At least biennially, adoptions [of textbooks for kindergarten through eighth grade] shall be made for all applicable levels for each of the following categories: (1) language arts, . . . (3) reading . . . ." (Ed. Code, § 60200, subd. (a) [all further undesignated statutory references are to the Education Code].) As noted in a 1988 Board publication, "Instructional Materials and Framework Adoption: Policies and Procedures" (which appears as an exhibit to the petition), the initial step in the selection of textbooks is the appointment of members to a Curriculum Framework and Criteria Committee by the Commission.[4] (§ 60205.) The Board has developed membership criteria and reserves approval of the appointments. This committee, not surprisingly, has the purpose of recommending a "curriculum framework," which is an outline of the state-mandated elements of a given course of study. (§§ 51002 & 60204, subd. (a).) The committee develops a draft framework (with public input at each meeting)[5] and presents it to the Commission subcommittee which has subject matter jurisdiction over the framework. Following a period of time for receipt of public comment on this draft, the subcommittee presents the framework and any revisions to the full Commission, along with criteria for evaluating textbooks for compliance with the framework. The Commission holds a formal public hearing, after which it presents the framework and the evaluation criteria to the Board. (§ 60204, subds. (a), (b).) The Board accords the public another hearing. It then issues the framework and evaluation criteria.

The Board (through the Department) subsequently issues invitations for publishers to submit textbooks. These invitations supply the timeline for the procedure, legal requirements, guidelines for "social content,"[6] and the educational evaluation criteria. The submitted textbooks proceed through parallel evaluations. In one line, they are subjected to a "legal compliance" review for social content by volunteers approved by the Board, a process which culminates in a second-level appeal (after which only subject matter content is considered). At the same time, the Commission's subject matter subcommittees form evaluation panels (subject to Board approval) and train them to evaluate the submitted textbooks in light of the established criteria. (§§ 60204, subd. (c) & 60205.) Membership on these panels is subject to criteria developed by the Commission and approved by the Board. The

[4]The Commission is the body charged by the Legislature with recommending minimum standards, frameworks, evaluation criteria, and textbooks (after initially evaluating them) to the Board. (§§ 33530, 33538, 60020, 60204.)

[5]The Board has made provision for public meetings in its discretion on any matter pending before it or its committees and commissions. (Cal. Code Regs., tit. 5, § 18460, subd. (b).)

[6]These are mandated both by the Legislature (§§ 60040-60047 & 60204, subd. (b)) and the Board (in a document entitled "Standards for Evaluation of Instructional Materials With Respect to Social Content").

Board has provided for the publishers to have an opportunity to appear before the panels for the purpose of responding to any criticisms of their textbooks. The panels then forward to the appropriate subject matter subcommittee their ratings of each textbook as recommended or not recommended, along with supporting strengths and weaknesses. The subcommittee receives public comment (the proposed textbooks having been put on public display at various locations) and issues a report to the full Commission, which includes a rationale for any rejections. Sitting as a whole, the Commission compiles the recommendations of its subcommittees and any additional public comment, holds a public hearing, makes any additions or deletions it deems advisable, and then submits the recommendations to the Board. These "finalist" textbooks are displayed for 30 days, and the Board gathers public comments.[7] Following a public meeting (§ 60203), the Board makes the final textbook determinations. (Cal. Const., art IX, § 7.5.) The local school district boards can thereafter purchase other textbooks only if they establish to the satisfaction of the Board that the approved textbooks do not "promote the maximum efficiency of pupil learning," in which case the Board authorizes the purchase of materials "as specified by the [Board]." (§ 60200, subd. (c).)

Beyond this framework, there are actually few facts relating to this particular plaintiff which are pertinent. On May 9, 1986, the Board adopted an "English-Language Arts Framework"[8] which included the evaluation criteria for textbooks for "Listening, Speaking, Reading, and Writing." In connection with the framework and its evaluation criteria, the Department developed worksheets for use by the evaluation panels. These worksheets assigned weighted factors to the various criteria, which cumulated in a total score intended to measure compliance with framework objectives. In October 1987, the Department issued invitations for publishers to submit textbooks for approval under this framework. Among the applicants was the plaintiff. The evaluation process began in March 1988. The panels gave an unfavorable evaluation of DISTAR. Steve and Jean Osborn, co-authors of DISTAR, appeared before the subcommittee with responses to the criticisms. Nevertheless, in its July 1988 recommendations, the Commission specifically recommended DISTAR not be adopted. The plaintiff filed a protest with the Board in August 1988. At the Board's September 1988 meeting, the plaintiff and Steve Osborn appeared in support of DISTAR and also objected that the adoption of English-Language Arts textbooks violated the APA. The

---

[7]In the sole regulation relating specifically to textbook approval, the Board has provided procedures for members of the public to submit comments on the Commission's recommendations. (Cal. Code Regs., tit. 5, § 18533.)

[8]Apparently this is a combined framework for the categories of language arts and reading listed separately in section 60200, subdivisions (a)(1) and (a)(3).

Board ultimately confirmed the Commission's recommendations with two additions in October 1988.

Any other relevant facts will be incorporated in the discussion where pertinent.

DISCUSSION

I

*The APA Applies to the Board*

A.

 As a prelude to our consideration of the applicability of the APA to the Board, we must first consider the Board's claim regarding the wellspring of its authority. The Board contends the Legislature did not intend that the APA would apply to its substantive constitutionally based textbook adoption standards and criteria. In its view, the rulemaking provisions of the APA, by their own terms, apply only to statutorily delegated legislative authority— not to substantive constitutionally based authority such as that delegated to it by the state Constitution.

Like several other bodies, the Board is created by the California Constitution, most recently in 1976. (Cal. Const., art. IX, § 7; see 2 Cal.Jur.3d, Administrative Law, § 18, pp. 232-234 & fn. 7.) As we have noted, the state Constitution also imbues the Board with the explicit power to select textbooks for the elementary schools. (Cal. Const., art. IX, § 7.5.) The venerable case of *People* v. *Board of Ed. of Oakland* (1880) 55 Cal. 331, supports the Board's position that it consequently has authority independent of any statute to execute this power. In that case the Attorney General had sought a writ of mandate to compel the local board under various statutes passed in the mid-1870's to continue to use the McGuffey series of readers, rather than switching to another. (*Id.* at p. 333.) However, article IX, section 7 of the California Constitution (adopted in 1879) provided in pertinent part, "The local Boards of Education . . . shall adopt a series of text-books for the use of the common schools within their respective jurisdictions." (See 55 Cal. at pp. 333-334.) The Supreme Court held this was a self-executing provision, not requiring any further action by the Legislature, which superseded the textbook-specifying statutes. (*Id.* at pp. 334-335.)

The Supreme Court reiterated this holding four score years later in *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441 [343 P.2d 8]. Rejecting an

effort by the Legislature to prohibit the selection of certain textbooks by declining to fund those specific textbooks in the Budget Act of 1958 (*id.* at pp. 446-448), the court said, "The language employed in the [Constitution] is simple and direct and no doubt is left as to the purpose intended.[9] The Constitution does not itself establish the State Board of Education, but it does confer upon that board certain enumerated powers and duties. It also provides that the [B]oard 'shall perform such other duties as may be prescribed by law.' There can be no doubt that it is only the duties other than those enumerated, or necessarily implied from such enumeration, that are made subject to legislative control. . . . It must therefore be concluded that the powers given to the [Board] . . . were intended to be exclusive and to be exercised by no other state agency, including the Legislature." (*Id.* at p. 463.)

But the fact that the Board has self-executing authority under the Constitution does not preclude the Legislature from enacting laws delineating that authority. (*Chesney* v. *Byram* (1940) 15 Cal.2d 460, 463 [101 P.2d 1106]; *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 609 [194 Cal.Rptr. 294].) ■ It is well established the Legislature may define, limit, or condition a constitutional power or right so long as it does not unduly burden the exercise of that power or right. (Cf. *Chesney, supra,* 15 Cal.2d at p. 465; *County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62, 75-76 [222 Cal.Rptr. 750]; 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 52, p. 95.) ■ Consequently, while the Board has a potential constitutional source of authority to adopt procedures if the Legislature does not act to implement that authority, once the Legislature does act to provide a procedure for textbook adoption, the Board must act under authority of those statutes. It could not, for example, claim that some residual constitutional source of power permits it to ignore the requirement of section 60200 that textbooks be selected in each of several categories, or choose textbooks which do not satisfy the framework for a given subject. In that sense it is no different than the veteran in *Chesney,* whose entitlement to a tax exemption flowed out of the statutes defining the exercise of the entitlement and not from the constitution itself, despite the fact our state charter created the right. The Board does not cite us any authority to the contrary in connection with itself or any of the other constitutional agencies. Thus, we turn to its arguments relating to the APA in light of this conclusion that the Board is acting pursuant to statute when it adopts rules and procedures for the selection of textbooks.

---

[9]The relevant constitutional language (as amended in 1912) then stated that the state Board should "provide, compile, or cause to be compiled, and adopt, a uniform series of textbooks for use in the day and evening elementary schools throughout the State . . . [and to] cause such textbooks, when adopted, to be printed and published. . . ." (See 52 Cal.2d at p. 446.)

## B.

We begin with the Board's argument that the relevant portions of the APA do not include it within their ambit. In adopting the APA, the Legislature has declared, "There has been an unprecedented growth in the number of administrative regulations in recent years [and] . . . [¶] [t]here exists no central office in state government with the power and duty to review regulations to ensure that they are written in a comprehensible manner, are authorized by statute and are consistent with other law." (Gov. Code, § 11340, subds. (a), (e).) For this reason, "it is in the public interest to establish an Office of Administrative Law [OAL] which shall be charged with the orderly review of adopted regulations. . . . [T]he [OAL] will be part of the executive branch of state government . . . ." (Gov. Code, § 11340.1.) The purpose of the APA is "to establish basic minimum *procedural* requirements for the adoption, amendment or repeal of administrative regulations." (Gov. Code, § 11346 [italics supplied].) The description of its scope states, "Except as provided in Section 11346.1 [relating to "emergency" regulations], the provisions of this article [Gov. Code, § 11346 et seq.] are applicable to the exercise of any quasi-legislative power conferred by any statute heretofore or hereafter enacted, but nothing in this article repeals or diminishes additional requirements imposed by any such statute. The provisions of this article shall not be superseded or modified by any subsequent legislation except to the extent that such legislation shall do so expressly." (Gov. Code, § 11346.)

A "regulation" under the APA is defined as "every rule, regulation, order, or standard of general application . . . adopted by any state agency to implement, interpret or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agency." (Gov. Code, § 11342, subd. (b).) The Board argues this definition of a regulation applies only to a rule, order, or standard of general application which is promulgated under statutory authority and thus its promulgation of procedures and criteria under its constitutional authority do not constitute "regulations." Its argument is that, read in context of the other statutes, the reference in the definition of regulation to "the law" enforced or administered by an agency must mean statutory law since the remaining provisions all explicitly refer to statutes. Even assuming, for the sake of argument, that this construction is correct, it provides no succor to the Board. We have already determined that the Board is acting under the Education Code, not the California Constitution, when it adopts rules for the evaluation of textbooks. Since the Board does not dispute its

procedures and criteria are the result of quasi-legislative determinations, they consequently come within the APA definition of regulations.[10]

## C.

Switching to the Education Code, the Board asserts a comparison of the language in a statute governing its general powers and a statute in the section dealing specifically with textbook selection reveals a legislative intent to exempt the Board from the APA. Section 33031 (the general statute) provides, "The [B]oard *shall* adopt rules and regulations not inconsistent with the laws of this state (a) for its own govern[ance], (b) for the govern[ance] of its appointees and employees, (c) for the govern[ance] of the day and evening elementary schools, the day and evening secondary schools, and the technical and vocational schools of the state, and (d) for the govern[ance] of such other schools . . . as may receive in whole or in part financial support from the state." (Italics supplied.) Section 60206, on the other hand, provides, "The [Board] *may* adopt appropriate regulations to implement this chapter. These regulations may include a procedure to review district invoices for instructional materials purchases . . . ." (Italics supplied.)

The Board reasons as follows. In the definitional part of the Education Code, the word " 'Shall' is mandatory and 'may' is permissive." (§ 75.) Consequently, the use of "may" in section 60206 discloses a legislative intent that the enactment of regulations by the Board is permissive, not mandatory. Next, unless section 60206 is construed as an exemption to section 33031's mandate for regulations, one or the other of the statutes is superfluous, which is contrary to the "settled axiom of statutory construction." (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1010.) From these two premises emerges the crux of the Board's argument. ■ Although it is phrased in terms of "*ejusdem generis*,"[11] it is more properly considered as a question of a special statute controlling over one which is more general (*Kennedy* v. *City of Ukiah* (1977) 69 Cal.App.3d 545, 552 [138 Cal.Rptr. 207]), since *ejusdem generis* is usually invoked in interpreting a single clause containing both general and restrictive language. (See, e.g., *Dyna-Med, Inc.*

---

[10]The Board's alternative interpretive argument (based on the principle courts should adhere to a constitutional interpretation of a statute when confronting an ambiguity (*Pacific Gas & Electric Co.* v. *Superior Court* (1983) 145 Cal.App.3d 253, 258-259 [193 Cal.Rptr. 336]) relies on its "separation-of-powers" argument, and will be subsumed in that discussion.

[11]Meaning literally, "of the same kind," the doctrine of *ejusdem generis* is of ancient vintage. (2A Sutherland, Statutory Construction (4th ed. 1984 rev.) § 47.17, p. 166.) As an intrinsic aid to statutory construction, the doctrine posits that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (*Ibid.* [fn. omitted].)

v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1390-1391 & fn. 12 [241 Cal.Rptr. 67, 743 P.2d 1323] ; *Martin* v. *Holiday Inns, Inc.* (1988) 199 Cal.App.3d 1434, 1437 [245 Cal.Rptr. 717].) The Board asserts the permissive language of section 60206 relates more specifically to text-book selection, so it controls over section 33031 *and* Government Code section 11346. Finally, since "nobody" has ever considered the Board's procedure for selecting textbooks to be covered by the APA, we should defer to this inchoate administrative "noninterpretation." (Cf. *American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252, 263 [109 Cal.Rptr. 22].)[12] However, even if we accord significance to the discord between sections 33031 and 60206, viz., that the Legislature did not intend to require the Board to enact regulations to carry out the mandate of section 60000 et seq., this does not support its conclusion that when it *does* promulgate regulations it is exempted from Government Code section 11346. We focus on this point of the Board's argument.

To quote its brief, "In comparison to this comprehensive statutory scheme specific to [the Board's] textbook adoption [procedure contained in sections 60000 et seq.], the rulemaking provisions of the APA are the 'general act' applicable 'to a myriad of state agencies whose regulatory powers encompass a broad spectrum of the business and professional activity in the state.' " The Board illustrates this comparison by citing our decision in *American Friends Service Committee* and the decision in *Lacy* v. *Orr* (1969) 276 Cal.App.2d 198 [81 Cal.Rptr. 276].

In the former case, the plaintiffs had obtained a writ of mandate in the trial court compelling the Director of Corrections and the California Adult Authority to comply with the APA in promulgating regulations. (*American Friends Service Committee, supra,* 33 Cal.App.3d at p. 254.) Under Penal Code section 5058 (enacted in 1944), the Director could "prescribe rules and regulations for the administration of the prisons and may change them at his pleasure." (33 Cal.App.3d at p. 258 [internal quotation marks and italics deleted].) The court focused on an ambiguity in the requirement an agency transmit every regulation to the OAL for filing with the Secretary of State, except a regulation which "[i]s directed to a specifically named person or to a group of persons and does not apply generally throughout the state." (Former Gov. Code, § 11380, subd. (a)(3) [Stats. 1959, ch. 2180, § 1, p. 5298].) The court was unable to determine under this provision whether prison regulations were of general application or were specifically directed. (33 Cal.App.3d at p. 261.) In light of the presumption against repeals by

---

[12]A fifth argument again relies on the maxim courts should select a constitutional interpretation of legislation; we again subsume the question within the "separation-of-powers" discussion.

implication (*id.* at p. 260), and the purposes of the two acts, the court did not believe the Legislature intended the APA (which was intended to provide notice to the public and an opportunity to be heard for those affected) to apply to prisoners (since they have no right to be heard), and citizens would otherwise have the right to inspect regulations (*id.* at pp. 261-262). Accordingly, the court held that the challenged "rules and regulations are embraced within the exception defined by Government Code section 11380, subdivision (a)(3), and are thus beyond the purview of APA." (*Id.* at p. 262.)

In an alternate holding, and the one which concerns us here, the *American Friends Service Committee* court relied upon the fact "that in 1944 the Legislature established a comprehensive plan for prison and inmate control" (33 Cal. App.3d at p. 258) and thus was "a legislative enactment of specific application . . . ." (*Id.* at p. 262.) In contrast to these provisions in the Penal Code, the 1947 APA "may fairly be described as a general act." (*Id.* at p. 263.) The court sought to harmonize the statutes by "treating the special act as an exception to the general." (*Id.* at p. 263.) So construed, the court held that the "provisions of the Administrative Procedure Act relating to procedure for adoption of rules and regulations (Gov. Code, §§ 11371-11445) are not applicable to the [Director of Corrections and California Adult Authority]."[13] (*Id.* at p. 263.)

In *Lacy*, the statutes at issue were the Vehicle Code and that portion of the APA governing administrative adjudications. (Gov. Code, §§ 11500-11529.) The appellant contended the hearing officer at his license revocation did not satisfy the requirements of the APA. (*Lacy, supra,* 276 Cal.App.2d at p. 201.) The court summarily rejected the argument, finding the specific provisions in the Vehicle Code governing hearings controlled over the general provisions of Government Code sections 11500-11529. (276 Cal.App.2d at pp. 201-202.)

*Lacy* is inapposite. Unlike the broad reach of Government Code section 11346, the scope of Government Code sections 11500-11529, dealing with administrative adjudications, is qualified: "This chapter applies to any agency *as determined by the statutes relating to that agency.*" (Gov. Code, § 11501, subd. (a) [italics supplied].) Courts have strictly interpreted this express limitation. (*Serenko* v. *Bright* (1968) 263 Cal.App.2d 682, 690 [70 Cal.Rptr. 1].) But unlike these provisions governing administrative adjudication, no such limitation applies to the provisions of the APA dealing with the promulgation of regulations. (Gov. Code, § 11346.)

---

[13]This holding was promptly abrogated by the Legislature, which amended Penal Code section 5058 in 1975 to its present form, making the APA expressly applicable. Penal Code section 5058, subdivision (a) now provides in relevant part: "The director may prescribe and amend rules and regulations for the administration of the prisons. The rules and regulations shall be promulgated and filed pursuant to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, . . ."

As for *American Friends Service Committee*, we must conclude with all due respect that it was wrongly decided on the specific/general point and therefore disapprove that portion of it. Although the opinion cites former Government Code section 11420 (Stats. 1947, ch. 1425, § 11, p. 2988), the identical predecessor to the present Government Code section 11346, it ignores it in its analysis. The statute expressly states, "the provisions of this article are applicable to the exercise of *any* quasi-legislative power conferred by *any* statute *heretofore or hereafter* enacted, but nothing in this article repeals or diminishes additional requirements imposed by any such statute. The provisions of this article shall not be superseded or modified by *any subsequent* legislation except to the extent that such legislation shall do so *expressly.*" (Gov. Code, § 11346 [italics supplied].) Thus, there is no problem of "repeal by implication"—there is an express basis for applying the APA to every other statute. With this express legislative statement of the statute's general applicability, a court should not apply the interpretative "general v. *special*" canon. (*In re L. L.* (1974) 39 Cal.App.3d 205, 214 [114 Cal.Rptr. 11].) Moreover, this Government Code provision allows other statutes to preempt it only where they are subsequently enacted and do so expressly. Thus, the language in the previously enacted former Penal Code section 5058 permitting the Director of Corrections to promulgate regulations "at his pleasure" is of no effect with respect to former Government Code section 11420 (or current § 11346 of that code). Finally, even if the result can be upheld on the basis that "at his pleasure" does have the effect of an explicit exemption, it is more direct language than the unadorned "may" in section 60206.

In short, the "general v. specific" paradigm has no application here.[14] Nor is the "may" in section 60206 an express limitation of the APA, since it applies only to whether regulations are required, not whether the regulations, if promulgated, must comply with the APA. Finally, we accord no significance to the Board's "administrative interpretation" that the APA is inapplicable, since that is the very problem the Legislature sought to remedy with the APA. (*Armistead* v. *State Personnel Board, supra,* 22 Cal.3d at p. 205.) Thus, we reject the Board's efforts to show the APA is inapplicable to the Board's textbook selection criteria and rules of procedure.

D.

This brings us to the Board's argument that subjecting it to the APA is unconstitutional. It describes the six standards in the APA under which the

---

[14]Indeed, if the doctrine were to come into play at all, it would be the reverse of that suggested by the Board; the Government Code contains specific language regarding the resolution of conflicts with other statutes, which controls over the general provisions of the Education Code regarding the necessity of regulations.

OAL reviews regulations[15] as "substantive" restrictions on the content of agency rulemaking in general and its own authority in particular. The Board then concludes this violates the "separation of powers" doctrine, because it interferes with its constitutional authority to select textbooks.[16] We return to the cases discussed earlier in connection with the source of the Board's authority.

Although concerned only with attempts to control the Board's *ultimate* selection of textbooks, the Supreme Court has intimated in dictum in several cases that the Legislature has the power to control the textbook selection process up to the penultimate step before that point. "It might very well be asked: What action of the Legislature is necessary to set this section in operation? Possibly the Legislature may prescribe rules by which boards shall be governed in selecting books, viz., to give notice, or to have the matter considered at some meeting called for the purpose, or other rule of machinery merely; but such legislation could not be used to take away the right of ultimate selection." (*Board of Ed. of Oakland, supra,* 55 Cal. at p. 335.)

In *State Board of Education* v. *Levit, supra,* the court noted, "The [Board] concedes that the Legislature has the right to determine the curriculum of the public elementary schools and to determine in what courses textbooks shall or shall not be used. It concedes that the Legislature could provide that no textbooks should be furnished for science classes, that science classes should not be taught in grades one and two, or that science classes should not be taught in those grades with textbooks. However, it maintains that if textbooks are to be used they shall be selected by [it]. Its choice of textbooks may be affected by the amount of the appropriation which the Legislature may make, by the form in which the appropriation is made, or by curriculum regulations. However, it argues that the Legislature may not validly interfere with the ultimate selection of textbooks made by the [Board] by a restrictive provision such as that contained in item 435." (52 Cal.2d at pp. 465-466.) And to reiterate the relevant part of our earlier quote from this case, "The Constitution does not itself establish the State Board of Education, but it does confer upon that [B]oard certain enumerated powers and duties. It also provides that the [B]oard 'shall perform such other duties as may be prescribed by law.' There can be no doubt that it is only the duties other than those enumerated, or necessarily implied from such enumeration, that are

---

[15]These "Six Commandments" are necessity, authority, clarity, consistency, reference, and nonduplication. (Gov. Code, §§ 11349, 11349.1.)

[16]The separation of powers argument stems from article III, section 3 of the California Constitution. "The powers of State government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.)

made subject to legislative control. . . . It must therefore be concluded that the powers given to the [Board] . . . were intended to be exclusive and to be exercised by no other state agency, including the Legislature." (*Id.* at p. 463.)

Finally, in *Smith* v. *State Board of Control* (1932) 215 Cal. 421 [10 P.2d 736], which involved a publisher seeking a writ of mandate to compel the control board to honor a contract between the education board and the publisher (*id.* at p. 423), the court discussed a number of statutes as if they had power to constrain the Board's selection process (*id.* at pp. 429-433), although ultimately asserting that the Board's authority to make the final selection could not be impinged. "It was the duty of the State Board of Education under the Constitution *and statutes of this state governing their action*, to provide for the use of the schools of the state the series of books which in the judgment of its members would be most suitable for that purpose. Having determined that question and decided in favor of text-books published by petitioners, its decision in that respect was final, and could not be affected in any manner by a showing that some other series of text-books[] could have been printed and published under state direction at a less[er] cost to the state." (*Id.* at p. 434 [italics supplied].)[17]

■ The dictum in these cases must be considered in light of the axiom that our state charter is a limit upon the plenary power of the Legislature, for which reason any provision contained in it which restricts the Legislature's power to enact laws is construed narrowly. (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].) ■ Therefore, the extent to which the Board's textbook selection power is a sanctum sanctorum safe from legislative invasion entails only its actual selection of the textbooks; that is all the state Constitution conveys to the Board.[18] Since making the APA applicable to the Board does not intrude upon that textbook selection power, there is no violation of the "separation-of-powers" doctrine.

But even if we were to construe the Board's constitutional prerogatives more broadly to include earlier steps in the process, there would still be no constitutional impediment to application of the APA because there is no

[17]This is a curious case in that not a single authority is cited, except on an irrelevant point (*id.* at p. 429). It is questionable to what extent the case can support the weight of the emphasized passage, as there is only an assumption, not an explicit consideration, of the question of the Legislature's authority, and cases are not authority for propositions not necessarily considered. (*People* v. *Ceballos* (1974) 12 Cal.3d 470, 481 [116 Cal.Rptr. 233, 526 P.2d 241].)

[18]Presumably the Legislature could not hamstring the Board by mandating procedures or criteria which would effectively eliminate any discretion on the Board's part to choose among texts. That question, however, is not before us in this case.

substantive interference with the Board's power. Although the Board purports to challenge the Legislature's authority, it never asserts the various provisions of the *Education Code* relating to textbook selection are invalid. Indeed, the Board relied on some of these statutes in seeking to avoid the APA. All the APA ensures is that the Board's regulations are authorized by the Education Code and are consistent with that code and other provisions of law. (Gov. Code, §§ 11340, subd. (e) [need for agency to ensure regulations "are authorized by statute and are consistent with other law"]; 11346 [APA establishes "basic minimum procedural requirements" for regulatory activity]; 11349.1, subd. (c) ["The regulations adopted by the [OAL] shall ensure that it does not substitute its judgment for that of the rulemaking agency as expressed in the substantive content of adopted regulations."].) If indeed the OAL were to exceed its mandate and intrude upon the Board's substantive authority by refusing to approve regulations with which it disagreed, the APA provides for review by the Governor's office and the courts. (*Id.*, §§ 11349.1, 11349.3, 11349.5, 11350.3.) Thus, the Board's concern is unfounded. In short, regardless of how broadly we might construe the Board's powers, nothing in the state constitution prevents us from ordering it to comply with the APA.

### E.

This leaves the Board's claim it should not have to submit the entirety of its procedures and criteria for textbook selection to the OAL. This argument simply misconstrues the extent of its obligation under the writ of mandate issued by the trial court. All the court ordered the Board to do was "to adopt, in compliance with the procedural requirements of the [APA] . . . for the adoption of regulations, any and all rules of general application, including but not limited to policies, procedures, standards, criteria, regulations and evaluation instruments used by the [B]oard to carry out its responsibility to adopt textbooks and instructional materials." If certain policies and procedures contained in the 1988 publication are, as the Board asserts, "essentially[] a reiteration of the extensive statutory scheme which the Legislature has established" in the Education Code, then there is obviously no duty on the part of the Board to enact regulations to cover such reiterations, since the sixth commandment of "nonduplication" prescribes "that a regulation does not serve the same purpose as a state . . . statute . . . ." (Gov. Code, § 11349, subd. (f).) But to the extent any of the contents of the 1988 publication depart from, or embellish upon, express statutory authorization and language, the Board will need to promulgate regulations, as the writ prohibits the Board "during the process of adopting textbooks . . . from using or relying on any policies, procedures, standards, criteria, regulations or evaluation instruments which have not been adopted in compliance with the procedural requirements of the [APA] . . . ."

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed. Plaintiff shall recover his costs on appeal.

Sims, J., and Davis, J., concurred.

A petition for a rehearing was denied January 21, 1992, and appellants' petition for review by the Supreme Court was denied March 19, 1992.

---

*See footnote, *ante*, page 47.