[No. S152360. Dec. 18, 2008.]

ALEXANDRA VAN HORN, Plaintiff and Appellant, v.
ANTHONY GLEN WATSON et al., Defendants and Respondents;
ANTHONY GLEN WATSON, Cross-complainant and Appellant, v.
LISA TORTI, Cross-defendant and Respondent.

## Counsel

Law Offices of Hutchinson & Snider and Robert B. Hutchinson for Plaintiff and Appellant.

Crandall, Wade & Lowe, Edwin B. Brown; McNeil, Tropp & Braun, McNeil, Tropp, Braun & Kennedy, Jeffrey I. Braun and Frank Cracchiolo for Defendants and Respondents and for Cross-complainant and Appellant.

Sonnenschein Nath & Rosenthal, Ronald D. Kent, Sekret T. Sneed; Hanger, Levine & Steinberg, Jody Steinberg and Lisa Mead for Cross-defendant and Respondent.

David K. Park; Hughes Hubbard & Reed, Rita M. Haeusler, George A. Davidson, Carla A. Kerr and Scott H. Christensen for Boy Scouts of America as Amicus Curiae on behalf of Cross-defendant and Respondent.

## Opinion

**MORENO, J.**—Under well-established common law principles, a person has no duty to come to the aid of another. (*Artiglio v. Corning, Inc.* (1998) 18 Cal.4th 604, 613 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; *Williams v. State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137].) If, however, a person elects to come to someone's aid, he or she has a duty to exercise due care. (*Williams, supra,* 34 Cal.3d at p. 23.) Thus, a "good Samaritan" who attempts to help someone might be liable if he or she does not exercise due care and ends up causing harm. (*Ibid.*) The Legislature has enacted certain statutory exceptions to this due care requirement. One such statute, Health and Safety Code section 1799.102, immunizes any "person who . . . renders emergency care at the scene of an emergency . . ." from liability for civil damages.[1]

---

[1] All further unlabeled statutory references are to the Health and Safety Code.

In this case, defendant Lisa Torti removed plaintiff Alexandra Van Horn from a vehicle involved in an accident and, by so doing, allegedly caused Van Horn to become paralyzed. In the resultant suit for negligence, Torti argued that she had provided "emergency care at the scene of an emergency" and was immune under section 1799.102. The trial court agreed and granted her motion for summary judgment, but the Court of Appeal reversed. We granted review to determine the scope of section 1799.102. We hold that the Legislature intended for section 1799.102 to immunize from liability for civil damages any person who renders emergency *medical* care. Torti does not contend that she rendered emergency medical care and she may not, therefore, claim the immunity in section 1799.102. Accordingly, we affirm the judgment of the Court of Appeal.

## I. BACKGROUND

During the evening of October 31, 2004, plaintiff, Torti, and Jonelle Freed were relaxing at Torti's home where plaintiff and Torti both smoked some marijuana.[2] After defendants Anthony Glen Watson and Dion Ofoegbu arrived, they all went to a bar at around 10:00 p.m., where they consumed several drinks. They remained at the bar until about 1:30 a.m., at which point they left.

Plaintiff and Freed rode in a vehicle driven by Watson; Torti rode in a vehicle driven by Ofoegbu. Watson lost control of his vehicle and crashed into a curb and light pole at about 45 miles per hour, knocking a light pole over and causing the vehicle's front air bags to deploy. Plaintiff was in the front passenger seat. When Watson's vehicle crashed, Ofoegbu pulled off to the side of the road and he and Torti got out to help. Torti removed plaintiff from Watson's vehicle. Watson was able to exit his vehicle by himself and Ofoegbu assisted Freed by opening a door for her.

There are conflicting recollections about several critical events: Torti testified at deposition that she saw smoke and liquid coming from Watson's vehicle, and she removed plaintiff from the vehicle because she feared the vehicle would catch fire or "blow up." Torti also testified that she removed plaintiff from the vehicle by placing one arm under plaintiff's legs and the other behind plaintiff's back to lift her out. Others testified, on the other hand, that there was no smoke or any other indications that the vehicle might explode and that Torti put plaintiff down immediately next to the car. Plaintiff testified that Torti pulled her from the vehicle by grabbing her by the arm and yanking her out "like a rag doll."

---

[2] The factual and procedural history is largely taken from the Court of Appeal's opinion.

Emergency personnel arrived moments later and plaintiff and Freed were treated and transported to the hospital. Plaintiff suffered various injuries, including injury to her vertebrae and a lacerated liver that required surgery, and was permanently paralyzed.

Plaintiff sued Watson, Ofoegbu, and Torti. Plaintiff asserted a negligence cause of action against Torti, alleging that even though plaintiff was not in need of assistance from Torti after the accident and had only sustained injury to her vertebrae, Torti dragged plaintiff out of the vehicle, causing permanent damage to her spinal cord and rendering her a paraplegic. Torti and Watson cross-complained against each other for declaratory relief and indemnity. After some discovery, Torti moved for summary judgment, arguing that she was immune under section 1799.102. The trial court granted Torti's motion.[3]

The Court of Appeal reversed. It held that the Legislature intended for section 1799.102 to apply only to the rendering of emergency *medical* care at the scene of a *medical* emergency and that Torti did not, as a matter of law, render such care.[4] Such a construction, the Court of Appeal explained, is consistent with the statutory scheme of which section 1799.102 is a part. We granted review.

## II. DISCUSSION

◼︎ Our primary duty when interpreting a statute is to " 'determine and effectuate' " the Legislature's intent.[5] (*Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].) To that end, our first task is to examine the words of the statute, giving them a commonsense meaning. (*People v. Nguyen* (2000) 22 Cal.4th 872, 878 [95 Cal.Rptr.2d 178, 997 P.2d 493].) If the language is clear and unambiguous, the inquiry ends. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284].) However, a statute's language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) With these principles of statutory construction in mind, we turn to the language of the provision.

---

[3] Although Torti's motion addressed only plaintiff's complaint, Torti and Watson stipulated that the trial court's order had a res judicata and/or collateral estoppel effect on their cross-complaints against each other. Plaintiff and Watson both appealed, and their appeals were consolidated.

[4] As previously noted, Torti does not contend that her actions at the scene of the automobile accident constituted medical care. Although we hold that section 1799.102 applies only to the rendering of emergency medical care, we express no opinion as to what constitutes such care.

[5] We conduct a de novo review of the Court of Appeal's statutory construction of section 1799.102. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 683 [102 Cal.Rptr.2d 97, 13 P.3d 704].)

Section 1799.102 provides, "No person who in good faith, and not for compensation, renders emergency care at the scene of an emergency shall be liable for any civil damages resulting from any act or omission. The scene of an emergency shall not include emergency departments and other places where medical care is usually offered." The parties identify two possible constructions of this provision: Torti urges us to conclude that it broadly applies to both nonmedical and medical care rendered at the scene of any emergency; plaintiff, on the other hand, argues that section 1799.102 applies only to the rendering of emergency *medical* care at the scene of a *medical* emergency. While section 1799.102 is certainly susceptible of Torti's plain language interpretation, a "[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) We conclude for several reasons that, when the statutory language is viewed in context, the narrower construction identified by plaintiff is more consistent with the statutory scheme of which section 1799.102 is a part.

### A. The Statutory Scheme and Related Provisions

#### 1. Purpose of the Scheme in Which Section 1799.102 Is Located

Section 1799.102 is located in division 2.5 of the Health and Safety Code. That division, titled "Emergency Medical Services" by the Legislature, was enacted as the Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act (Act). (§ 1797 et seq.; Stats. 1980, ch. 1260, § 7, p. 4261.) One can infer from the location of section 1799.102 in the Emergency *Medical* Services division, as well as from the title of the act of which it is a part, that the Legislature intended for section 1799.102 to immunize the provision of emergency *medical* care at the scene of a medical emergency. (*People v. Hull* (1991) 1 Cal.4th 266, 272 [2 Cal.Rptr.2d 526, 820 P.2d 1036].)[6]

---

[6] The Court of Appeal reasonably concluded that "[a] general immunity statute would more likely be found in the Civil Code . . . ." Torti disagrees, noting that "the seminal Good Samaritan statute lies in . . . Business [and] Professions Code [section 2395]." However, that provision applies to licensed physicians and, as such, its placement in the Business and Professions Code is unsurprising. On the other hand, one would not expect a statute broadly immunizing from liability *any* person who renders *any* type of care at the scene of *any* emergency to be located in the Health and Safety Code, let alone division 2.5, the Emergency Medical Services division of that code.

Additionally, apart from the name of the division and the Act, the Legislature made clear in numerous other statutes that it intended for the statutory scheme to address the provision of emergency *medical* care. For example, in section 1797.1, the Legislature declared that it is the intent of the Act "to provide the state with a statewide system for emergency *medical* services . . . ." (Italics added.) In section 1797.6, subdivision (a), the Legislature declared that it is "the policy of the State of California to ensure the provision of effective and efficient emergency *medical* care." (Italics added.) Indeed, nowhere in the Act's general provisions (Health & Saf. Code, div. 2.5, ch. 1, §§ 1797–1797.8) is there any indication that the Legislature intended to address or affect the provision of *nonmedical* care.

Section 1797.5 is even more illuminating. That statute explains that "It is the intent of the Legislature to promote the *development, accessibility, and provision of emergency medical services* to the people of the State of California. [¶] Further, it is the policy of the State of California that people shall be *encouraged and trained to assist others at the scene of a medical emergency.* Local governments, agencies, and other organizations shall be *encouraged to offer training in cardiopulmonary resuscitation and lifesaving first aid techniques* so that people may be adequately trained, prepared, and encouraged to assist others immediately." (Italics added.) Section 1797.5 thus establishes that the Legislature intended to encourage people to learn and provide emergency *medical* care (such as the cardiopulmonary resuscitation and first aid specifically identified in § 1797.5) to those in need. The Act's stated purpose supports construing section 1799.102 to immunize only those who render such emergency medical care at the scene of a medical emergency.

Construing section 1799.102 to apply only to the rendering of emergency medical care is also in keeping with adjoining section 1799.100 (there is no § 1799.101), another immunity provision. Section 1799.100 provides: "In order to encourage local agencies and other organizations to train people in emergency medical services, no local agency, entity of state or local government, or other public or private organization which sponsors, authorizes, supports, finances, or supervises the training of people, or certifies those people . . . shall be liable for any civil damages alleged to result from those training programs." Read together, sections 1799.100 and 1799.102 first immunize those who train persons in emergency medical care and then immunize the persons who actually render such care. The strong inference to

be drawn is that the Legislature intended for both statutes to apply to emergency medical care. (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra*, 43 Cal.3d at p. 1387 [explaining that courts should harmonize statutes related to the same subject].)

### 2. *Definition of "Emergency" in Section 1797.70*

■ Chapter 2 of division 2.5, Emergency Medical Services, contains definitions which govern the provisions of the division. (§ 1797.50; see §§ 1797.52–1797.97.) Of particular relevance is section 1797.70, which defines "emergency" as meaning "a condition or situation *in which an individual has a need for immediate medical attention*, or where the potential for such need is perceived by emergency personnel or a public safety agency." (Italics added.) Section 1799.102, the provision at issue here, immunizes persons who render "*emergency* care at the scene of an *emergency* . . . ." (Italics added.) Section 1797.70 thus makes clear that the phrase "scene of an emergency" in section 1799.102 refers to the scene of a *medical* emergency.[7]

Although the phrase "emergency care" is not separately defined, section 1797.70's definition of "emergency" certainly supports the conclusion that the Legislature intended for "emergency care" to be construed as meaning emergency *medical* care. After all, if the "scene of an emergency" (§ 1799.102) means a scene where "an individual has a need for *immediate medical attention*" (§ 1797.70, italics added), it logically follows that the Legislature intended for the phrase "emergency care" in section 1799.102 to refer to the *medical attention* given to the individual who needs it.

This construction also comports with the second sentence of section 1799.102, which reads: "The scene of an emergency shall not include emergency departments and other places where medical care is usually offered." While this sentence does not directly shed light on the intended meaning of the phrase "emergency care" in the previous sentence of section 1799.102, the fact that the Legislature excluded "emergency departments and other places where medical care is usually offered" from section 1799.102's immunity supports construing "emergency care" as meaning emergency

---

[7] At oral argument, counsel for Watson and Van Horn suggested that there was a factual dispute over whether Van Horn was at the "scene of an emergency." We disagree. The Court of Appeal concluded that Van Horn, "having been injured in a car accident, required immediate medical attention," and nowhere in their briefing did counsel take issue with the court's conclusion. Nor, in their oppositions to Torti's motion for summary judgment, did counsel identify any factual disputes about whether Van Horn needed immediate medical attention.

*medical* care—the exclusion suggests that "emergency departments and other places where medical care is usually offered" are locations where the Legislature did not need (or want) to encourage ordinary citizens to provide emergency medical care because trained medical personnel are available to better render such care.

### 3. Definition of "Emergency Services" in Section 1799.107

Section 1799.107 encourages public entities and emergency rescue personnel to render emergency assistance by providing that "a qualified immunity from liability shall be provided for public entities and emergency rescue personnel providing emergency services." (*Id.*, subd. (a).) The Legislature defined the phrase "emergency services" in subdivision (e) of the provision, stating that "[f]or purposes of this section, 'emergency services' includes, but is not limited to, first aid and medical services, rescue procedures and transportation, or other related activities necessary to insure the health or safety of a person in imminent peril." (Italics added.) Section 1799.107 thus explicitly immunizes from liability emergency rescue personnel who render medical *and/or nonmedical* care.

While the Legislature broadly defined the phrase "emergency services" in section 1799.107, subdivision (e), it explicitly limited the definition's application to that provision. This implies for a number of reasons that the Legislature intended for "emergency services" in section 1799.107 to be construed more broadly than "emergency care" in section 1799.102. First, it would make little sense for the Legislature to explicitly limit the application of section 1799.107's broad definition if it intended for section 1799.102 to be read in similarly expansive terms. Second, the Legislature demonstrated in section 1799.107 that it understands how to broadly define a term when it so desires—and its decision not to define "emergency care" in section 1799.102 in like fashion strongly implies it did not intend for the phrase to be so construed.[8] Third, if the Legislature understood the phrase "emergency care" to self-evidently include both medical and nonmedical care, as Torti suggests, there would have been little need to explicitly define an analogous term ("emergency services") in section 1799.107 to include both types of care.[9]

---

[8] That the Legislature would have wanted to provide a broader immunity in section 1799.107 than in section 1799.102 is unsurprising—the former provision immunizes trained emergency rescue personnel while the latter applies to any person.

[9] Torti warns that construing "emergency care" in section 1799.102 to mean only emergency medical care will circumscribe *section 1799.107's* immunity. Her concern is without basis. As she acknowledges, section 1799.107, subdivision (e) defines "emergency services" for purposes of that statute; thus, our construction of the phrase "emergency care" in section 1799.102 does not affect 1799.107 in any way.

■ Accordingly, we conclude that, when construed in context and harmonized with related provisions relating to the same subject matter, section 1799.102 immunizes only those persons who render emergency *medical* care.

### B. *Additional Reasons to Prefer a Narrower Interpretation*

We briefly address three additional reasons to prefer plaintiff's narrower construction of section 1799.102 to the broader one urged by Torti.

#### 1. *Legislative History of Section 1799.102 Supports the Narrower Interpretation of the Provision*

The legislative history of section 1799.102 and its predecessor, former section 1767 (Stats. 1978, ch. 130, § 8, p. 345), supports the conclusion that the Legislature intended to immunize the provision of emergency *medical* care at the scene of *medical* emergencies.

Assembly Bill No. 1301 (1977–1978 Reg. Sess.) (Assembly Bill No. 1301), the legislation that added former section 1767, was intended to encourage citizen involvement in providing emergency assistance, such as cardiopulmonary resuscitation and first aid, to other citizens. (Assem. Com. on Health, Analysis of Assem. Bill No. 1301 (1977–1978 Reg. Sess.) May 2, 1977, p. 2.) To that end, as the Legislative Counsel's Digest notes, the bill "add[ed] provisions giving . . . persons . . . who render *emergency medical services*, immunity from liability [for] civil damages . . . ." (Legis. Counsel's Dig., Assem. Bill No. 1301 (1977–1978 Reg. Sess.) 4 Stats. 1978, Summary Dig., p. 35, italics added.) One such provision, former section 1767, provided that "In order to encourage *people to participate in emergency medical services training programs* and to *render emergency medical services* to others, no person who in good faith renders emergency care at the scene of an emergency shall be liable for any civil damages resulting from any act or omission. . . ."[10] (Stats. 1978, ch. 130, § 8, p. 345, italics added.) This legislative history supports our conclusion—that section 1799.102 was only intended to apply to emergency *medical* care.

---

[10] The legislation enacting former section 1767, as originally proposed, would have also immunized a person who "transports an injured person for emergency medical treatment" (Assem. Bill No. 1301, as introduced Mar. 31, 1977, p. 6.) The language was deleted (Assem. Bill No. 1301, as amended June 10, 1977, p. 6), implying the Legislature decided against immunizing the type of assistance Torti says she provided, namely, removing plaintiff from the vehicle so she could receive medical treatment.

First, according to the Legislative Counsel's digest, the Legislature's purpose in enacting the immunity provisions was to protect those "who render emergency medical services . . . ."[11] (Legis. Counsel's Dig., Assem. Bill No. 1301 (1977–1978 Reg. Sess.) 4 Stats. 1978, Summary Dig., p. 35.) Second, former section 1767 specifically provided that its purpose was to encourage people to participate "in emergency medical services training programs" and to "render emergency medical services to others . . . ." (Stats. 1978, ch. 130, § 8, p. 345.) Thus, it seems beyond dispute that, in passing Assembly Bill No. 1301, the Legislature intended for the term "emergency care" in former section 1767 to refer to emergency *medical* care.

Legislative history suggests the term "emergency care" in section 1799.102 was intended to be interpreted in like fashion. The immunity set forth in section 1799.102 is essentially identical to the immunity in former section 1767, which implies the Legislature intended an identical scope. Additionally, while former section 1767's prefatory language explaining the immunity's purpose does not appear in section 1799.102, its absence does not suggest the Legislature intended to alter the immunity's original purpose. The language was merely moved to the previously discussed section 1797.5 (see *ante*, p. 328). Thus, the legislative history indicates that, as with former section 1767, the Legislature intended section 1799.102 to apply only to those who render emergency medical care.[12]

### 2. *Torti's Broad Interpretation Would Undermine Well-established Common Law Principles*

Torti's expansive interpretation of section 1799.102 would undermine long-standing common law principles. As we previously noted, the general rule is that "one has no duty to come to the aid of another." (*Williams v. State of California, supra*, 34 Cal.3d at p. 23.) As explained in the Restatement Second of Torts, "The origin of the rule lay in the early common law distinction between action and inaction, or 'misfeasance' and 'non-feasance.' " (Rest.2d Torts, § 314, com. c, p. 116.) Courts were more concerned with affirmative acts of misbehavior than they were with an individual "who merely did nothing, even though another might suffer serious harm because of his omission to act." (*Ibid.*)

---

[11] Although the Legislative Counsel's summary digests are not binding (*State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1233, fn. 9 [48 Cal.Rptr.3d 144, 141 P.3d 256]), they are entitled to great weight. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].)

[12] Indeed, one would expect that, had the Legislature intended to alter the scope of the immunity that previously existed in former section 1767, some mention of its intent would have made it into the legislative history. The absence of any such discussion suggests the Legislature did not so intend. (See *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 589 [48 Cal.Rptr.3d 340].)

■ While there is no general duty to help, a good Samaritan who nonetheless "undertakes to come to the aid of another . . . is under a duty to exercise due care in performance . . . ." (*Williams v. State of California, supra,* 34 Cal.3d at p. 23, citing Rest.2d Torts, § 323.) As we explained in *Artiglio v. Corning,* " '[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to a duty of acting carefully, if he acts at all.' (*Glanzer* v. *Shepard* (1922) 233 N.Y. 236 [135 N.E. 275].)" (*Artiglio v. Corning, Inc., supra,* 18 Cal.4th at p. 613.)

■ The broad construction urged by Torti—that section 1799.102 immunizes *any* person who provides *any* emergency care at the scene of *any* emergency—would largely gut this well-established common law rule. As we recently noted, " '[w]e do not presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied.' " (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1325 [57 Cal.Rptr.3d 644, 156 P.3d 1100].) Torti does not identify anything that would overcome the presumption that the Legislature did not intend to work such a radical departure.

### 3. *Broad Interpretation Would Render Other "Good Samaritan" Statutes Unnecessary Surplusage*

As the Court of Appeal points out, Torti's sweeping construction of section 1799.102 would render other "good Samaritan" statutes superfluous. For example, Government Code section 50086 immunizes anyone with first aid training who is asked by authorities to assist in a search and rescue operation and who renders emergency services to a victim. The statute defines "emergency services" to include "first aid and medical services, rescue procedures, and transportation or other related activities." (*Ibid.*) It is difficult to see what conduct Government Code section 50086 immunizes that would not already be protected under section 1799.102 as it is interpreted by Torti. Any person providing "emergency services" under Government Code section 50086 would, according to Torti, also be rendering "emergency care" at the scene of an emergency under section 1799.102, thereby Government Code section 50086 would be unnecessary. Axioms of statutory interpretation counsel us to avoid such constructions. (*Englemann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 56 [3 Cal.Rptr.2d 264].)

Torti's interpretation would similarly affect Harbors and Navigation Code section 656, subdivision (b). That provision immunizes any person who

provides assistance "at the scene of a vessel collision, accident, or other casualty . . . ." Immunity extends to "any act or omission in providing or arranging salvage, towage, medical treatment, or other assistance." (*Ibid.*) Torti's broad construction of the terms "emergency care" and "scene of an emergency" in section 1799.102 would appear to swallow Harbors and Navigation Code section 656, while a narrower interpretation of section 1799.102 would avoid that problem.

## III. Disposition

In light of the foregoing reasons, we conclude that the Legislature intended for section 1799.102 to immunize from liability for civil damages only those persons who in good faith render emergency medical care at the scene of a medical emergency. We accordingly affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., and Werdegar, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—Health and Safety Code section 1799.102[1] states that "[n]o person who in good faith, and not for compensation, renders *emergency care* at the *scene of an emergency* shall be liable for any civil damages resulting from any act or omission." (Italics added.) Nothing in this clear statement limits or qualifies the *kind* of emergency aid—medical or nonmedical—that an uncompensated lay volunteer may provide without fear of legal reprisal from the person he or she tried to help.

A statute's plain language is a dispositive indicator of its meaning unless a literal reading would lead to absurd consequences the Legislature did not intend. (E.g., *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888 [80 Cal.Rptr.3d 690, 188 P.3d 629]; *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131 [72 Cal.Rptr.3d 382, 176 P.3d 654]; *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) The plain meaning of section 1799.102 does not produce absurd results; on the contrary, it implements sound and logical public policy. The statute protects from the threat of civil litigation a layperson who, acting as a "Good Samaritan," reasonably perceived that another human being needed immediate emergency assistance and intervened, despite possible personal risk and danger, to provide it. The purpose, of course, is to encourage persons not to pass by those in need of

---

[1] All further unlabeled statutory references are to the Health and Safety Code.

emergency help, but to show compassion and render the necessary aid. There is no reason why one kind of lay volunteer aid should be immune, while another is not.

Yet the majority imposes an arbitrary and unreasonable limitation on the protection this statute affords to Good Samaritans. The majority rewrites section 1799.102 to insert the word "medical" at two crucial points *where it does not appear*—once before the word "care" and again before the word "emergency." Thus, the majority concludes, the statute affords immunity only for emergency *medical* care rendered by an uncompensated layperson at the scene of a *medical* emergency.

Under the majority's distorted statutory reading, an uncompensated *lay volunteer*—whether or not trained in the rudiments of first aid—is immune for any incompetent and injurious *medical* assistance he or she renders to a person in need of medical treatment, but is fully exposed to civil liability for emergency *rescue* or *transportation* efforts intended to prevent injury to an endangered victim in the first instance, or to ensure that a victim in need of immediate medical treatment can receive it.

Thus, in the majority's view, a passerby who, at the risk of his or her own life, saves someone about to perish in a burning building can be sued for incidental injury caused in the rescue, but would be immune for harming the victim during the administration of cardiopulmonary resuscitation out on the sidewalk. A hiker can be sued if, far from other help, he or she causes a broken bone while lifting a fallen comrade up the face of a cliff to safety, but would be immune if, after waiting for another member of the party to effect the rescue, he or she set the broken bone incorrectly. One who dives into swirling waters to retrieve a drowning swimmer can be sued for incidental injury he or she causes while bringing the victim to shore, but is immune for harm he or she produces while thereafter trying to revive the victim.

Here, the result is that defendant Lisa Torti has no immunity for her bravery in pulling her injured friend from a crashed vehicle, even if she reasonably believed it might be about to explode, though she would have been immune if, after waiting for someone else to undertake the physical and legal risk of rescue, she then caused harm by attempting to administer to the victim's injuries at the roadside.

I cannot believe the Legislature intended results so illogical, and so at odds with the clear statutory language. I therefore respectfully dissent from the majority's interpretation of section 1799.102.

In a grudging understatement, the majority admits section 1799.102 is "certainly susceptible" to the "plain language" interpretation that all unpaid volunteer emergency aid rendered in good faith at the scene of an emergency is immune. (Maj. opn., *ante*, at p. 327.) Yet the majority raises numerous objections against this construction, even though it conforms both to the statutory language and to sound reason. None of the majority's arguments is persuasive.

First, the majority points to the location of section 1799.102 in a statutory division (div. 2.5) of the Health and Safety Code, entitled the Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act (§ 1797 et seq.; hereafter Act), that is primarily devoted to emergency medical services. This indicates, the majority concludes, that by using the term "emergency care" in section 1799.102, the Legislature meant only to immunize emergency medical care at the scene of a medical emergency.

However, it is well established that " '[t]itle or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute.' " (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1119 [29 Cal.Rptr.3d 262, 112 P.3d 647].) The Health and Safety Code itself contains an express codification of this principle. (§ 6 ["Division, part, chapter, article, and section headings do not in any manner affect the scope, meaning, or intent of the provisions of this code."].)

Indeed, contrary to the conclusion the majority seeks to draw, the very fact that the statutes in division 2.5 refer so frequently and specifically to "emergency *medical* services" (see, e.g., §§ 1797.1, 1797.5, 1797.72, 1798.175, 1799.100, 1799.106, 1799.110, 1799.111)[2] and "emergency *medical* care" (e.g., §§ 1797.274, 1799.110) (all italics added) suggests that omission of the word "medical" in the immunity provision at issue here was not inadvertent, but purposeful.

This omission makes eminent sense in context. While most of division 2.5 is concerned in detail with the organized provision of emergency *medical* services by public agencies, and by entities and individuals trained, certified, and employed in that particular field, section 1799.102 has both a broader and a narrower reach. It applies to *uncompensated* "emergency care" provided "at

---

[2] Section 1797.72 defines " '[e]mergency *medical* services,' " for purposes of division 2.5 of the Health and Safety Code, to mean "the services utilized in responding to a *medical* emergency." (Italics added.) As the majority indicates, the Act does not define the distinct term "emergency care."

the scene of an emergency" by any "person," regardless of the individual's training in either emergency medical care or nonmedical emergency rescue procedures. (*Ibid.*) In this context, there is no reason to distinguish between medical and nonmedical assistance provided by the volunteer as the basis for immunity.

Moreover, despite its title, division 2.5, by its express terms, is not only concerned with the provision of emergency care of a strictly medical nature. As an apt case in point, section 1799.107 provides a qualified immunity from civil liability to public agencies and "emergency *rescue* personnel" for acts undertaken by such personnel, "within the scope of their employment to provide emergency services." (*Id.*, subd. (b), italics added.) Such " 'emergency services' " are defined to encompass acts *in addition to* the provision of emergency medical treatment, expressly including, "but . . . not limited to . . . *rescue procedures and transportation*, or other related activities necessary to insure the health *or safety* of a person in imminent peril." (*Id.*, subd. (e), italics added.)

The majority suggests, however, that by making section 1799.107's broad definition of "emergency services"—which clearly includes both medical and nonmedical emergency aid—applicable "[f]or purposes of this section" (*id.*, subd. (e)), the Legislature signaled its intent that a strictly medical definition of "emergency care" should apply elsewhere in the statutory scheme. Such is not the case.

The legislative history of section 1799.107 indicates a much narrower purpose, one not at all inconsistent with the plain meaning of section 1799.102. As originally adopted in 1980 (Stats. 1980, ch. 1260, § 7, p. 4261 et seq.), the Act included section 1799.102 in its current form, but did not include section 1799.107. As to emergency personnel in particular, the only statutory tort immunities at that time were contained in Government Code section 850.4, which immunized public employees and entities for injury (other than motor vehicle injury) caused while fighting fires, or by the condition of fire protection equipment or facilities, and in section 1799.106 (part of the Act), which then, as now, provided a *qualified* immunity to law enforcement officers, firefighters, and certain certified emergency medical technicians for "emergency *medical* services" provided "at the scene of an emergency." (Italics added.)

Thereafter, a Court of Appeal decision held that Government Code section 850.4 provided an immunity only for firefighting activities, and thus did not

immunize firefighters who had rescued a camper pinned under a fallen tree. (*Lewis v. Mendocino Fire Protection Dist.* (1983) 142 Cal.App.3d 345, 346–347 [190 Cal.Rptr. 883].) In response, the Legislature adopted section 1799.107 (Stats. 1984, ch. 275, § 1, pp. 1462–1463), specifying that all "emergency rescue personnel," including firefighters, have a qualified immunity for *both* first aid and medical service at the scene of an emergency *and* all other emergency rescue and transportation activities necessary to ensure the well-being of an endangered person.

Legislative history documents make clear that section 1799.107's purpose was simply to countermand the holding of *Lewis.* (See, e.g., Sen. Com. on Judiciary, analysis of Sen. Bill No. 1120 (1983–1984 Reg. Sess.) as amended July 1, 1983, pp. 2–3; Assem. Com. on Judiciary, analysis of Sen. Bill No. 1120 (1983–1984 Reg. Sess.) as amended Aug. 16, 1983, p. 1.) There is no indication of any legislative intent to imply that "emergency care," as used in section 1799.102, conferred immunity on uncompensated lay volunteers for a narrower range of emergency aid at the scene of an emergency. As indicated above, there would be no logical reason to do so.[3]

The majority stresses that a major purpose of the Act is to maximize the public availability of training in emergency medical services, and to encourage laypersons to obtain such training so they can assist others at the scene of a medical emergency. (§§ 1797.5, 1799.100.) This general policy suggests, in the majority's view, that the Legislature sought only to immunize such emergency medical assistance.

But the declared immunity is for "emergency care," not "emergency medical care," and it simply is not linked to the emergency assister's completion of emergency medical training. The immunity applies regardless of whether the uncompensated layperson rendering assistance has been trained in emergency first aid. Thus, there is no basis to infer that the Legislature intended a quid pro quo—a limited immunity in return for the person's completion of a specified kind of training program.

---

[3] The majority posits that it was logical for the Legislature to immunize a broader range of emergency aid in section 1799.107 than in section 1799.102, because the former statute governs trained emergency service personnel, while the latter applies to any person. But any suggestion that the Legislature intended greater immunity for trained personnel is belied by the fact that section 1799.102 offers *absolute* immunity for "good faith" "emergency care" rendered by any "person" at an emergency scene, while section 1799.107—similarly to several other immunity statutes covering trained emergency personnel—affords only a *qualified* immunity that does not extend to acts, medical or nonmedical, performed by emergency service personnel "in bad faith or in a grossly negligent manner." (*Id.*, subd. (b); see also discussion, *post.*)

Indeed, any direct connection that previously existed in the legislative scheme among emergency medical training, emergency medical assistance, and the immunity for "emergency care" has been severed. As the majority notes, former section 1767, the predecessor of section 1799.102, specifically provided that "[i]n order to encourage people to participate in emergency medical services training programs and to render emergency medical services to others, no person who in good faith render[ed] emergency care at the scene of an emergency" would be civilly liable for such actions undertaken in good faith. (Former § 1767, as added by Stats. 1978, ch. 130, § 8, p. 345.)

But as the majority must also acknowledge, the Legislature omitted the introductory "[i]n order to" phrase from section 1799.102, as adopted in 1980. The current immunity provision, unlike its predecessor, contains no language suggesting that the narrow purpose of the immunity is to encourage public participation in emergency medical service training, or to render emergency aid that is specifically medical in nature.[4]

The inference thus arises that no such link is now intended. We are left with the logic that medical or nonmedical emergency aid may be the priority need in a particular emergency situation. Activities of a nonmedical nature may be essential in order to save a victim from injuries that would require medical attention, or to place an injured victim in a position where medical care can be administered. All such actions thus deserve equal encouragement, and there is no reason to believe the Legislature thought otherwise when it adopted section 1799.102. If actual training in emergency medical services is not a prerequisite of immunity for uncompensated laypersons who provide emergency aid—and section 1799.102 makes clear that it is not—then there is no reason to construe the clear and unqualified immunity for "emergency care" to refer only to emergency medical care.

Next, the majority suggests that, for purposes of section 1799.102, the "scene of an emergency" at which the statutory immunity applies has a special and limited meaning. The majority points to the definitional portion of the Act, which includes a section, far removed from section 1799.102, defining an "emergency" as "a condition or situation in which an individual has a need for immediate medical attention, or where the potential for such need is perceived by emergency medical personnel or a public safety agency." (§ 1797.70.)

---

[4] The majority suggests the language that appeared in former section 1767, but was deleted from section 1799.107, was simply "moved" to section 1797.5. (Maj. opn., *ante*, at p. 332.) To be sure, section 1797.5 states a legislative intent to encourage the training of persons "to assist others at the scene of a medical emergency." What is critical, however, is that this policy is no longer stated as the purpose of the immunity granted in section 1799.102 to any "person" who renders "emergency care at the scene of an emergency."

But the Act makes clear that its definitions apply only "[u]nless the context otherwise requires." (§ 1797.50.) That exception must apply here, for the definition set forth in section 1797.70 makes little sense in the context of section 1799.102.

Section 1797.70's definition of "emergency" well suits those portions of the Act dealing with trained emergency medical personnel and the emergency medical services they furnish. However, if applied literally to section 1799.102, this definition would greatly undermine the incentive for uncompensated laypersons, as first responders, to proffer even emergency *medical* assistance. By its terms, section 1799.102 purports to encourage any "person," acting in "good faith," to provide necessary emergency help, and it does not require that the volunteer possess any particular training or expertise. Yet, under section 1797.70's definition of "emergency," section 1799.102 would afford immunity to a good faith lay volunteer only if his or her untrained perception of a need for immediate medical attention proved, in hindsight, to be correct, or if the volunteer waited for public agency representatives or emergency medical personnel to arrive and perceive such a need.

This cannot be what section 1799.102 intended. It seems more sensible to infer that, in section 1799.102, "emergency" has its normal, commonsense meaning as a sudden occurrence or unexpected situation that demands immediate action. (See, e.g., Merriam-Webster's Collegiate Dict. (11th ed. 2004) p. 407, col. 1; Webster's 3d New Internat. Dict. (2002 ed.) p. 741, col. 2; 5 Oxford English Dict. (2d ed. 1989) p. 176, col. 1; American Heritage Dict. (2d college ed. 1985) p. 448, col. 2.)

The majority notes that section 1799.102, which immunizes "emergency care at the scene of an emergency," does itself refer to "medical care" at one point, when it provides that "[t]he scene of an emergency shall not include emergency departments and other places where medical care is usually offered." From this, the majority infers that "emergency care" and "medical care" are equivalent terms within the section, and that the "scene of an emergency" means the scene of a medical emergency *other than* an emergency medical care facility.

Again, however, the inference is not persuasive. Section 1799.102's obvious and logical purpose is to encourage volunteers, even if untrained, to render whatever immediate aid appears necessary at an emergency scene where no other help may be available. Consistent with that aim, the Legislature may well have seen no need to immunize a lay volunteer for emergency

aid *of any kind* given at a place devoted to the provision of emergency medical care. An emergency occurring at such a location is most likely to be medical. Personnel trained to respond to such an emergency are readily at hand, and any response is best left to them. Indeed, the facility's staff is likely to be better trained and equipped than a lay volunteer to handle even the nonmedical aspects of an emergency occurring at such a scene.

The majority asserts that if section 1799.102 were construed to provide immunity for both medical and nonmedical emergency care, the statute would render several other immunity provisions superfluous. But a close examination of the statutes the majority cites does not support this conclusion. Section 1799.107 affords "public entit[ies]" and "emergency rescue personnel" a *qualified* immunity when they provide "emergency services" (*id.*, subd. (b)), but the immunity does not apply when their actions were performed with gross negligence (*ibid.*). Thus, emergency rescue personnel, unlike the unpaid volunteers protected by section 1799.102, are held to minimal standards of care in keeping with their training and their compensated professional status.

The immunity in Government Code section 50086, also cited by the majority, extends *beyond* the scene of an emergency when the person immunized has first aid training and was asked to participate in a search and rescue operation. Similarly, the immunity provided by Harbors and Navigation Code section 656, subdivision (b) applies to the peculiar dangers of boating and marine navigation, but it is not strictly confined to "emergency" situations.

Finally, the majority insists we should not lightly imply a broad exception to the common law rule that one who voluntarily comes to the aid of another is liable for his or her negligence in doing so. I do not find this premise a persuasive reason for ignoring the plain language of section 1799.102.

At the outset, I dispute the majority's suggestion that an interpretation of section 1799.102 to include both medical and nonmedical "emergency care at the scene of an emergency" would "largely gut" the common law rule. (Maj. opn., *ante*, at p. 333.) The rule applies, of course, in every case where one person decides to come to the aid of another, while section 1799.102 applies only to emergency aid at an emergency scene. Further, I submit, the emergency to which the statute applies must be one that *would be perceived as such by a reasonable person* who confronts the circumstances.

In such extreme situations, where prompt aid by a first responder may be the difference between life and death, the Legislature has every reason to be

concerned that the harshness of the common law rule would discourage citizens from providing necessary emergency assistance to their neighbors. Thus, the Legislature could well conclude that it should immunize persons willing, under such stressful and potentially dangerous circumstances, to provide, without compensation, any form of help that might serve to alleviate the emergency.

As I have indicated, the majority's interpretation creates a *less rational* exception to the common law rule, because it would immunize lay volunteers only for the very kinds of help—i.e., *medical* assistance in *medical* emergencies—that most clearly require special training and expertise such persons are unlikely to possess. I am not convinced the Legislature had such an aim, contrary to the plain language it used in section 1799.102.

I therefore conclude that this statute protects from civil liability any person who, without compensation, renders emergency assistance of any kind during a situation he or she reasonably perceives to be an emergency. Accordingly, I believe, defendant Torti could not be denied summary judgment under section 1799.102 simply for the reason that any emergency assistance she rendered to plaintiff Alexandra Van Horn at the scene of the accident was not "medical" in nature.

On the other hand, I am not persuaded that defendant Torti has satisfied all the prerequisites for immunity under section 1799.102. The statute requires that the assistance must have been given "at the scene of an emergency." (*Ibid.*) Counsel for plaintiffs suggested at oral argument that there were factual disputes raising questions about whether defendant Torti actually and reasonably believed there was an "emergency" situation that required her to extricate plaintiff Van Horn from the accident vehicle before qualified emergency rescue personnel arrived at the scene to undertake that task. I agree with this assessment.

As the majority recounts, "Torti testified at deposition that she saw smoke and liquid coming from [the] vehicle, and she removed plaintiff [Van Horn] from the vehicle because she feared [it] would catch fire or 'blow up.' . . . Others testified, on the other hand, that there was no smoke or any other indications that the vehicle might explode and that Torti put [Van Horn] down immediately next to the car." (Maj. opn., *ante*, at p. 325.) These ambiguities raise, in my view, triable issues whether Torti rendered, or actually and reasonably believed she was rendering, "*emergency* care at the scene of an *emergency*." (§ 1799.102, italics added.)

Accordingly, I conclude defendant Torti was not entitled to summary judgment under the auspices of section 1799.102.[5] On that basis, I, like the majority, would affirm the judgment of the Court of Appeal.

Chin, J., and Corrigan, J., concurred.

The petition of respondent Lisa Torti for a rehearing was denied February 11, 2009. Baxter, J., Chin, J., and Corrigan, J., were of the opinion that the petition should be granted.

---

[5] The majority asserts there are *no* triable issues against Torti as to whether she acted at "the scene of an emergency," because there is no dispute that Van Horn, having been injured in the accident, was in immediate need of medical attention. This conclusion, however, flows from the majority's erroneous premise that "the scene of an emergency," for purposes of section 1799.102, is any situation, but only a situation, in which someone has the need for immediate *medical* help. If, as I believe, the purpose of section 1799.102 is to immunize generally a good faith "emergency" response to an "emergency" situation, then "the scene of an emergency" must be construed as a situation calling for the particular kind of emergency response that was provided.