[No. B201556. Second Dist., Div. Five. Mar. 27, 2009.]

THE FIFTH DAY, LLC, Plaintiff and Appellant, v.
JAMES P. BOLOTIN et al., Defendants and Respondents.

COUNSEL

Varner & Brandt and Keith A. Kelly for Plaintiff and Appellant.

Richard E. Blasco, Inc., and Richard E. Blasco for Defendants and Respondents.

OPINION

**ARMSTRONG, Acting P. J.**—Plaintiff and appellant The Fifth Day, LLC (Plaintiff), entered into an agreement with Industrial Real Estate Development Company (Owner) to provide certain "industrial real estate development and construction project management" services with respect to real property located in Chino, California. Plaintiff sued Owner and its principals, Pacific Allied Industrial Corporation and James P. Bolotin (together referred to as Defendants), for compensation alleged to be due for services rendered by Plaintiff.

The trial court granted summary judgment in favor of Defendants on the ground that Plaintiff was acting as a general building contractor and therefore was required to hold a license pursuant to Business and Professions Code[1] section 7026; because it had no such license, it was barred by section 7031, subdivision (a), from maintaining this action. On appeal, Plaintiff contends that (1) it was not a contractor within the meaning of section 7026; (2) it was exempt from the license requirement because it was an owner of the property or a partner of Owner; and (3) even if some of the services it rendered required a contractor's license, it nevertheless could be compensated for other services that did not require a license. We determine that Plaintiff was not a contractor within the meaning of the licensing statute, and its claims are therefore not barred by section 7031, subdivision (a). Consequently, we reverse the judgment.

FACTUAL AND PROCEDURAL SUMMARY

In 1999, Defendants owned 12.3 acres of land (the Property) in Chino, California, adjacent to land owned by Chino Industrial Commons, LLC (CIC). Plaintiff's managing member was Kevin Knox. At Knox's urging, Defendants and CIC agreed to develop their properties jointly.[2] To that end, the Property was divided into three parcels designated lots Nos. 19, 20 and

---

[1] All statutory references are to the Business and Professions Code unless stated otherwise.

[2] From the record, it appears that only the Property, which was owned by Defendants, is at issue in this case.

21. CIC entered into 52-year ground leases on the three lots. The ground lease for lot No. 20 required CIC to construct a 55,000-square-foot building on the lot. Once the building was completed, CIC was to assign its interest in lot No. 20 back to Defendants, and Defendants were to convey to CIC a fee simple interest in lots Nos. 19 and 21. No rent was payable by CIC under the ground leases for the first two years, but rent was payable thereafter.

CIC failed to construct the building on lot No. 20 during the first two years of the lease term, and rent began to accrue under the ground leases at a rate of 5 cents per square foot, or approximately $24,000 per month. In February 2001, rather than pay the rent, CIC assigned the three ground leases—along with its obligation to construct the building—to Plaintiff. The development plan for the Property was changed to a seven-building commercial office park. Lot No. 20 was redesignated as lots Nos. 1 and 2, and lots Nos. 19 and 21 were redesignated as lots Nos. 3 through 7. Plaintiff undertook to construct two buildings totaling 55,000 square feet on lots Nos. 1 and 2 (formerly lot No. 20) in return for a fee simple interest in lots Nos. 3 through 7 (formerly lots Nos. 19 and 21). Plaintiff was responsible for financing the construction.

By early 2003, Plaintiff had not constructed the buildings and owed Defendants $465,000 in back rent. Plaintiff negotiated with PCI[3] to obtain financing for the construction. Under the agreement contemplated between Plaintiff and PCI, Plaintiff would assign the ground leases to PCI. PCI would finance the construction of the seven buildings, pay Defendants the accrued back rent, and pay Plaintiff $100,000. Plaintiff was to receive a "Project Incentive Fee" based on a 25 percent share of the profits from the sale of the development.

Defendants refused to consent to the assignment of the ground leases contemplated in the PCI deal, and proposed instead to finance the construction on terms similar to the PCI deal, including reassignment of the ground leases back to Defendants. Defendants proposed to increase Plaintiff's Project Incentive Fee to 34 percent of the profits. Knox stated in his declaration that Plaintiff "reluctantly" accepted Defendants' proposal because of the increased Project Incentive Fee.

This agreement is memorialized in a document dated May 5, 2003, between Plaintiff and Owner entitled "Development Management Agreement For the Construction of The Campus at CIC" (the DMA). Owner is referred to as the "Owner" and Plaintiff as the "Development Manager."

---

[3] In his declaration, Knox refers to PCI as "Principal Capital Management."

The DMA recites that Owner wishes to undertake the development of the entire property. To do so, "Owner desires to have Professional Development and Construction Management Services to assist the Owner . . . ." Plaintiff was "experienced in industrial real estate development and construction project management and is willing to provide to Owner these services."

Plaintiff was to be paid a fixed development fee of $100,000 as a nonrefundable advance against a Project Incentive Fee of 34 percent of a defined "Project Value." The DMA provided, "The Owner agrees that for purposes of this agreement, any and all lease rents accrued are included in the value of the Land Contribution and that the leases for Lots 19, 20 and 21 previously entered into are to be terminated as and by those Lease Terminations attached as Exhibit ___."

The DMA specified that Plaintiff was to perform the following duties "as Owner may specifically and expressly direct":

—To "identify critical and high priority matters and promptly report the same to Owner," and with respect to matters "requiring any immediate action" to "make recommendations for a short-term contingency plan to minimize Owner's exposure to loss or damage."

—To provide "advice or opinions with respect to the development of an overall strategic plan for the management and administration of the Project."

—To "coordinate and direct" the activities of design professionals hired by Plaintiff.

—To obtain building and special permits, "except for permits required to be obtained directly by the various contractors."

—To provide advice or opinions with respect to (1) "developing the budget for construction costs" and "controlling the overall budget for the Project," and (2) "Owner's efforts to keep the Project moving forward" on budget and on time.

—To update the budget regularly, including a comparison between anticipated and actual expenses.

—To "provide cost and performance evaluations of alternative materials and systems . . . ."

—To provide a project development schedule setting forth Plaintiff's "good faith estimate of how long the regulatory and construction phases of the Project will last."

—To hold and document regularly scheduled preconstruction meetings with Owner to "update the Owner, discuss issues, plan strategies to meet objectives and solve problems."

—To provide "opinions or advice on administrative and management matters that relate to the coordination of work among and between the Contractors, Subcontractors, Disbursement Agent, Owner and the Design Professional(s)."

—To assist the general contractor in "developing bidders' interest in the Project, establish bidding schedules and assist the Owner in preparing construction contract document packages."

—To assist the general contractor in the subcontractor bidding process and to ensure that the general contractor performs its duties with respect to bids from subcontractors and material suppliers.

—To receive and review required certificates of insurance from the design professionals and contractors.

—To "use commercially reasonable efforts to achieve satisfactory performance from each of the Contractors and Subcontractors."

—To conduct daily "on-site inspections and reviews" during construction, and to attend and report to Owner on "all on-site Project status meetings . . . ."

—To provide to Owner summaries of and to document all change proposals and change orders.

—To "ensure that the contract documents contain all necessary independent testing and inspection" and to "regularly review the testing and inspection reports . . . ."

—To report to Owner monthly "regarding the status of all or part of the Project."

—To review with Owner monthly a draw request package, including approved applications for payment.

—To maintain the financial books and records for the project.

—To report cash disbursements related to the project.

— To maintain contact information for the project team.

—To "coordinate the completion and correction of the work" and to "assist the Design Professional(s) in conducting substantial final inspections."

In addition, Plaintiff warranted and represented that (1) it was "experienced, competent and qualified to perform the work contemplated by" the DMA; (2) it had and would maintain "sufficient facilities, expertise, staff, assets and other resources to perform its duties"; (3) it held and would hold "all licenses, permits or other certifications necessary to perform its duties"; and (4) Owner would "have full knowledge and involvement in the Project."

In January 2004, Owner entered into a construction contract (the Contractor Agreement) with Fullmer Construction, pursuant to which Fullmer agreed to complete specified work, including the construction of seven concrete tilt-up buildings on the Property, for a fee of nearly $4.9 million. Knox, Plaintiff's principal, was designated in the Contractor Agreement as the Owner's representative. As such, Knox represented the Owner with respect to "all aspects of the [Contractor] Agreement and the execution and performance of the Work including, without limitation, the authority to give approvals and consents and the authority to execute Prime Contract Change Orders less than [$25,000] and provide directions to Contractor."

Plaintiff performed the services required of it under the DMA. Construction was completed, and certificates of occupancy for the project issued in December 2004.

Plaintiff alleged that, between December 2004 and March 2005, Owner sold three of the buildings. According to Knox, Owner paid Plaintiff in excess of $785,000 in Project Incentive Fees. Plaintiff alleged that Owner subsequently sold or leased the remaining four buildings, but refused to pay Plaintiff the additional Project Incentive Fees earned under the DMA. Plaintiff alleged that as a result, Defendants owe Plaintiff approximately $1.8 million in additional Project Incentive Fees.

Plaintiff sued Defendants for breach of contract and on common counts for money had and received and for services rendered. The trial court sustained Defendants' demurrers to the original complaint with leave to amend on the ground that Plaintiff failed to allege that it was a licensed contractor and was therefore barred from bringing suit by section 7031. Plaintiff thereafter filed a

first amended complaint that (1) omitted the common count for services rendered, (2) recast Plaintiff's cause of action for breach of contract to allege the breach of a partnership agreement, and (3) sought the additional remedies of rescission and restitution. Defendants again demurred on the ground that section 7031 barred Plaintiff's suit. This time, the trial court overruled the demurrer, concluding that Plaintiff had alleged facts that, if true, avoided the section 7031 bar.

Defendants subsequently moved for summary judgment on the sole ground that section 7031 barred Plaintiff's suit. The trial court granted the motion, concluding that the undisputed facts established that Plaintiff was a contractor within the meaning of section 7026; because Plaintiff was not licensed, its action was barred by section 7031. The trial court entered judgment in favor of Defendants.[4] Plaintiff timely appealed.

## STANDARD OF REVIEW

On an appeal from a grant of summary judgment, we examine the record de novo to determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1245–1246 [82 Cal.Rptr.3d 440].) We view the evidence in a light favorable to, and resolve any evidentiary doubts or ambiguities in favor of, the nonmoving party. (*Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at pp. 768–769.) The moving party bears the burden to demonstrate "that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) If the moving party makes a prima facie showing, the burden shifts to the party opposing summary judgment "to make [its own] prima facie showing of the existence of a triable issue of material fact." (*Ibid.*) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.)

Contract interpretation on undisputed facts is a question of law that we review de novo. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Employers Mutual Casualty Co. v.*

---

[4] Because the summary judgment did not resolve Owner's cross-complaint against Plaintiff alleging the latter's breach of the DMA, the judgment did not name Owner. We therefore dismissed Plaintiff's appeal with respect to Owner.

*Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347 [86 Cal.Rptr.3d 383].) Statutory interpretation also is a question of law that we review de novo. *(Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) "Our primary duty when interpreting a statute is to ' "determine and effectuate" ' the Legislature's intent. [Citation.] To that end, our first task is to examine the words of the statute, giving them a common-sense meaning. [Citation.] If the language is clear and unambiguous, the inquiry ends. [Citation.] However, a statute's language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]" *(Van Horn v. Watson* (2008) 45 Cal.4th 322, 326 [86 Cal.Rptr.3d 350, 197 P.3d 164], fn. omitted.)

## DISCUSSION

Although Plaintiff advances a number of arguments to support its position that its lack of licensure does not preclude it from suing for compensation earned under the terms of the DMA, the central question presented in this appeal is whether an entity which provides construction management services to a private owner developing commercial real property is required to be licensed pursuant to the Contractors' State License Law. The licensing law itself does not identify construction managers as workers requiring licensure. Defendants nevertheless argued below, and now on appeal, that sections "7026 and 7057, and the holdings of the California Supreme Court, make it quite clear that a person or entity that provides supervision and/or management services for any construction project, must be licensed as a 'general building contractor,' so as to 'protect the public from dishonesty and incompetence in the administration of the contracting business.' " Defendants' position is untenable.

■ A "contractor"—a term "synonymous with 'builder' " according to section 7026—is required to hold one of three categories of contractor's license: Class A (general engineering contractor), class B (general building contractor), or class C (covering "specialty" licenses). (§§ 7055–7058.) Section 7026 defines "contractor" as "any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, parking facility, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, . . . whether or not the performance of work herein described involves the addition to, or fabrication into, any structure, project, development or improvement herein described of any material or article of merchandise. 'Contractor' includes subcontractor and specialty contractor."

A review of Plaintiff's duties under the DMA reveals that it was to assist, on behalf of the Owner, in coordinating the activities of the various workers to enable them to complete their assigned tasks in an organized and efficient manner, on time and on budget; to maintain records such as insurance certificates, as well as the financial books and records for the project; to keep the Owner apprised of the status of the project; to be the on-site "point person" to respond to issues as they arose; and generally to act as the Owner's agent with respect to the various parties connected with the development of the project. Plaintiff had no responsibility or authority to perform any construction work on the project, or to enter into any contract or subcontract for the performance of such work.

■ It is undisputed that Plaintiff neither contracted with Owner to perform any of the activities listed in section 7026's definition of a contractor, nor performed any of those activities. Indeed, Owner entered into a construction contract with Fullmer Construction, a licensed general contractor, to perform and/or supervise all construction on the project, and Fullmer Construction hired all of the subcontractors who performed construction services with respect to the project. In no way did the DMA contemplate that Plaintiff was to perform construction services, or assume the general contractor's responsibilities under the construction contract.

Defendants rely on section 7057 to argue that construction management services such as those set forth in the DMA may not be performed without a general contractor's license. That statute defines a "general building contractor" as "a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of at least two unrelated building trades or crafts, *or to do or superintend the whole or any part thereof*." (§ 7057, subd. (a), italics added.) From the foregoing definition, Defendants argue, "It is clear . . . that the performance of any specific trade or craft in connection with the construction of a structure . . . is not required for a person or entity to be engaged in the business of performing the function of a 'general building contractor.' The statute itself . . . includes in the definition of a 'general building contractor'[] any person or entity that superintends the whole or any part of a structure being built." This is a misstatement of the law. Section 7057 provides that any *contractor* who engages in the listed activities is a general building contractor, not that any "person" or "entity" that *does so comes within the definition. If Plaintiff is not a contractor* (because it does not perform the activities listed in section 7026 which defines a contractor), it is, by definition, not a general contractor.

In addition to sections 7026 and 7057, Defendants rely on two California Supreme Court cases to support their argument that construction managers are required to be licensed: *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141 [308 P.2d 713] and *Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988 [277 Cal.Rptr. 517, 803 P.2d 370]. Neither of these cases may reasonably be read to create a new category of workers requiring licensure under the Contractors' State License Law.

In *Lewis & Queen v. N. M. Ball Sons, supra*, 48 Cal.2d 141, the plaintiff entered into an agreement for "the removal of concrete, application of water, excavation, overhaul, and compacting of original ground" in connection with the construction of the Hollywood Parkway. (*Id.* at p. 145.) The Supreme Court found that "plaintiff actually undertook to and did in fact 'construct a highway' for defendant, and thereby acted as a contractor within the meaning of section 7026 . . . ," "and that because it had done so without the license required by section 7028, it was barred by section 7031 from maintaining any action for compensation." (*Id.* at pp. 147, 146.) In *Hydrotech Systems, Ltd. v. Oasis Waterpark, supra*, 52 Cal.3d 988, the plaintiff, a foreign manufacturer of water park equipment, contracted to construct a wave-making attraction at a California venue. The Supreme Court "granted review to decide two questions. The first is whether section 7031 permits an unlicensed nonresident to sue upon an 'isolated transaction' in California where 'exceptional circumstances' exist, even though there was no substantial compliance with California's licensing law. The second—an issue of potentially broad importance—is whether section 7031 bars an unlicensed contractor's *fraud* action against the person for whom the work was done." (*Id.* at p. 992, original italics.) This simple recitation of the facts of these cases makes abundantly clear that they are in no way analogous to the situation before us, and have nothing whatsoever to say about the licensure of construction managers. In short, Defendants have directed us to no California cases which discuss, much less hold, that a construction manager must be licensed under the Contractors' State License Law.[5]

We note as well that the Legislature provided that construction managers on public works projects must be licensed architects, engineers or general contractors. (Gov. Code, § 4525, subd. (e).) The Legislature determined that licensure was required for public works projects, and so enacted a statute to that effect; the fact that a similar statute applicable to privately owned real

---

[5] While clearly not persuasive authority for our conclusion, we note that at least one treatise on California construction law definitively states California licensure law does not regulate construction management on private works. (Acret et al., Cal. Construction Contracts, Defects, and Litigation (Cont.Ed.Bar 2008) § 2.19, p. 95.) This statement is supported by dicta in *Dorsk v. Spivack* (1951) 107 Cal.App.2d 206, 209 [236 P.2d 840] ["So far as statutory law is concerned, there is no provision of the Business and Professions Code which requires a mere supervisor or superintendent of building construction to be licensed"].)

estate development projects was not enacted strongly suggests that the Legislature determined that licensure of construction managers was not necessary in that arena.

■ In short, the Legislature has not defined the term "contractor" to include persons who perform construction management services such as those set forth in the DMA.[6] It is within the sole purview of the Legislature to determine whether private construction project managers should be licensed. To this end, the Legislature is empowered to conduct public hearings on the merits of such licensure, to solicit the views of the various players in the building industry who would be affected by such a requirement, and to amend the licensing law if it concludes that the public interest would be better served by such a revision. Unless and until the Legislature does so, its failure to expressly address the issue must be the last word.

## DISPOSITION

The judgment is reversed. Plaintiff is to recover its costs on appeal.

Kriegler, J., concurred.

**MOSK, J.,** Dissenting.—I respectfully dissent.

This case is one of first impression. The issue is whether a person who acts as a construction manager but who performs many of the services of a general building contractor can avoid the contractor license requirement of Business and Professions Code section 7028.[1]

The legal principles involved in this case can have significant effects. The Contractors' State License Law is intended to prevent unqualified and unscrupulous contractors from preying on people. Now, those unqualified, unscrupulous and unlicensed contractors have a loophole in the license requirement that will facilitate their illicit or incompetent activities—they need merely call themselves "construction managers" rather than "contractors" and, regardless of the services they perform, the licensing requirement will not apply. The Legislature did not intend such a result.

---

[6] That the Legislature has given *some* consideration to the subject is evident from the enactment of the Construction Management Education Sponsorship Act of 1991, section 7139 et seq. That construction management is an established job classification distinct from other professionals involved in the construction trade is revealed by a simple Google search of "construction management degree": UCLA Extension and UC Berkeley Extension each offer a certificate program in construction management; a number of undergraduate institutions award bachelor degrees with a major in construction management; and Georgetown University awards a postbaccalaureate degree, master of professional studies in real estate, with a focus on construction management.

[1] All statutory references are to the Business and Professions Code unless stated otherwise.

The Contractors' State License Law defines a "contractor" subject to the license requirement by the nature of the services performed, not by job title. (§ 7026.) When, as in this case, a construction manager undertakes to perform some of the services of a general contractor, then that construction manager must be a licensed contractor. I would affirm the judgment.[2]

## INTRODUCTION

The majority opinion accurately sets forth the facts. In summary, plaintiff and appellant The Fifth Day, LLC (plaintiff), entered into a development management agreement (the DMA) with Industrial Real Estate Development Company (IRED) to provide certain "industrial real estate development and construction project management" services with respect to real property located in Chino, California (the Property). Plaintiff sued IRED and its principals, Pacific Allied Industrial Corporation (Pacific Allied) and James P. Bolotin, for compensation alleged to be due for services rendered by plaintiff.[3]

The trial court granted summary judgment in favor of Bolotin on the ground that plaintiff was acting as a contractor required to hold a professional license pursuant to sections 7026 and 7028. Because plaintiff had no such license, it was barred by section 7031, subdivision (a) from maintaining this action. On appeal, plaintiff contends that (1) plaintiff was not a contractor within the meaning of section 7026; (2) plaintiff was exempt from the license requirement because it was an owner of the Property or a partner of IRED; and (3) even if some of the services plaintiff rendered required a contractor's license, plaintiff nevertheless could be compensated for other services that did not require a license.

I would hold that the construction management services described in the contract were those of a contractor that required a license. I also conclude that because plaintiff did not raise in the trial court its contention that it was exempt from the license requirements, it forfeited that issue. Even if plaintiff had not forfeited that issue, it failed to submit evidence sufficient to raise triable issues with respect to its claimed exemption. Finally, I

---

[2] This case comes up on a summary judgment. The majority opinion does not foreclose defendant from establishing at trial that plaintiff actually performed services in such a manner that a contractor's license was required.

[3] Plaintiff alleged in its first amended complaint that James P. Bolotin, Pacific Allied, and IRED were the alter egos of one another. As defendants are related, for convenience I refer to them individually and collectively as Bolotin.

conclude that plaintiff is not entitled to partial compensation for any work performed under the contract that did not require a license. A contractor performing services under an integrated contract that provides for substantial services requiring a license may not recover partial compensation for other contract services for which no license is required and which are not separable from the services requiring a license.

## DISCUSSION

A. *The Contractors' State License Law*

1. *The Section 7028 License Requirement and the Section 7031 Litigation Bar*

Section 7028 makes it unlawful to engage in the business of or to act in the capacity of a contractor without a license. (See *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 147 [308 P.2d 713].) "To protect the public, the Contractors' State License Law [§ 7000 et seq.] imposes strict and harsh penalties for a contractor's failure to maintain proper licensure. Among other things, the [Contractors' State License Law] states a general rule that, regardless of the merits of the claim, a contractor may not maintain any action, legal or equitable, to recover compensation for 'the performance of any act or contract' unless he or she was duly licensed '*at all times* during the performance of that *act or contract*.' (§ 7031, subd. (a) . . . , italics added.)"[4] (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 418 [30 Cal.Rptr.3d 755, 115 P.3d 41], fn. omitted (*MW Erectors*).) Section 7031 thus "bars a person from suing to recover compensation for *any* work he or she did under an agreement for services requiring a contractor's license unless proper licensure was in place *at all times* during such contractual performance." (*MW Erectors, supra*, 36 Cal.4th at p. 419.)

Section 7031 "reflects a strong public policy, which favors protecting the public from unscrupulous and incompetent contractors. According to our Supreme Court, 'The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and

---

[4] Section 7031, subdivision (a) provides in relevant part, "[N]o person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person . . . ."

construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [Citations.]' [Citations.]" (*WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 587 [76 Cal.Rptr.3d 8].) " 'Because of the strength and clarity of this policy,' the Supreme Court has observed, 'section 7031 applies despite injustice to the unlicensed contractor. "Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business *outweighs any harshness between the parties*, and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of this state. [Citation.] . . ." [Citations.]' [Citation.]" (*Id.* at p. 589.) "Thus, an unlicensed contractor cannot recover either for the agreed contract price or for the reasonable value of labor and materials. [Citations.] The statutory prohibition operates even where the person for whom the work was performed knew the contractor was unlicensed." (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 997 [277 Cal.Rptr. 517, 803 P.2d 370] (*Hydrotech*).)

### 2. *Definition of "Contractor"*

Section 7026 specifies those required to have a contractor's license. That provision defines a "contractor" to be "any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, parking facility, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, . . . whether or not the performance of work herein described involves the addition to, or fabrication into, any structure, project, development or improvement herein described of any material or article of merchandise. 'Contractor' includes subcontractor and specialty contractor. . . ."

"Section 7026 plainly states that both the person who provides construction services himself and one who does so 'through others' qualifies as a 'contractor.' The California courts have also long held that those who enter into construction contracts must be licensed, even when they themselves do not do the actual work under the contract. [Citations.] Indeed, if this were not the rule, the requirement that general contractors be licensed would be completely superfluous." (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 941 [29 Cal.Rptr.2d 669] (*Vallejo Development*).)

Section 7026.1, subdivision (b) states that the term "contractor" "includes" a "consultant to an owner-builder . . . who or which undertakes, offers to undertake, purports to have the capacity to undertake, or submits a bid, to construct any building . . . or part thereof." Section 7057, subdivision (a) defines a "general building contractor" to be "a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons . . . , requiring in its construction the use of at least two unrelated building trades or crafts, or to do *or superintend* the whole or any part thereof." (Italics added.)

### B. *Whether Plaintiff Was a Contractor*

It is undisputed that plaintiff was not licensed as a contractor. The issue in this case is whether, pursuant to section 7031, subdivision (a), plaintiff "act[ed] in the capacity of a contractor" under the DMA—that is, whether the services plaintiff undertook to provide were such that plaintiff was required to hold a contractor's license. As I discuss, under the DMA, plaintiff acted in the capacity of a contractor by undertaking to perform such services as the coordination of work and the supervision of other licensed construction professionals, and therefore was required to hold a contractor's license under the Contractors' State License Law.

#### 1. *Plaintiff Undertook to Act as a Construction Manager, Not as a Mere "Advisor"*

Plaintiff contends that its role under the DMA was that of a mere "advisor" that provided "basic consulting services to the Owners to ensure the timely completion of the project." That assertion is inconsistent with the plain terms of the DMA. Plaintiff's essential role under the DMA was as a construction manager with extensive responsibilities.

As the DMA recites, plaintiff was engaged because IRED "desire[d] to have Professional Development and *Construction Management Services* to assist the Owner" in completing the project. (Italics added.) The DMA further recited that plaintiff was "experienced in industrial real estate development and *construction project management* and is willing to provide to Owner *these* services." (Italics added.)

The specific duties assigned to plaintiff support that characterization. Although "the duties and responsibilities of a construction manager vary greatly from contract to contract" (5 Bruner & O'Connor on Construction Law (May 2008) § 16:15 (Bruner & O'Connor)), "[t]here is a limited number of services required to be performed on a construction project." (*Ibid.*) As a result, "the construction manager will perform the services typically undertaken by another participant to the construction process. The array of services

usually available for the construction manager to perform are the nondesign functions of the architect and engineer and the nonconstruction activities of the general contractor. It is not uncommon to encounter construction managers performing such customary design professional services as cost estimating and contract administration. Nor is it unusual for construction managers to perform such customary general contractor functions as coordination and scheduling of the work." (*Ibid.*) As described by an authority, one form agreement prepared by the Construction Management Association of America provides that "the construction manager assists the owner in selecting the design professional and in preparing the contract between the owner and the design professional, prepares a master schedule and a budget, prequalifies bidders, conducts prebid conferences, participates in the bid opening, advises as to the acceptance or rejection of bids, provides a management team to provide contract administration as an agent of the owner, reviews requests for information, shop drawings and other submittals, conducts project meetings, prepares requests for proposals for change order work, reviews and adjusts payment application, and prepares and signs certificates for payment." (Acret, Cal. Construction Law Manual (6th ed. 2008) § 4:28, p. 285; see also Gov. Code, § 4529.5 [mandating that construction project managers on public works projects "have expertise and experience in construction project design review and evaluation, construction mobilization and supervision, bid evaluation, project scheduling, cost-benefit analysis, claims review and negotiation, and general management and administration of a construction project"].) Plaintiff's services under the DMA included many that are frequently provided by construction managers. Plaintiff was not a mere "advisor."

### 2. *Plaintiff Was Not the Owner's Employee*

Plaintiff argues that a construction manager acting as an owner's agent does not need a contractor's license. Plaintiff relies on a 1974 Attorney General opinion (57 Ops.Cal.Atty.Gen. 421 (1974)) and the decision in *Dorsk v. Spivack* (1951) 107 Cal.App.2d 206 [236 P.2d 840]. Those authorities do not support plaintiff's position. Section 7044 exempts from the license requirement owners who, themselves or through employees who receive wages as their sole compensation, perform construction work on their own property. (§ 7044, subds. (a), (b).) Based on that exemption, the authorities relied upon by plaintiff conclude that an owner's *employee* who receives wages as his or her sole compensation may supervise construction on an owner's behalf without a license. (*Dorsk v. Spivack, supra*, 107 Cal.App.2d at pp. 208–209 [substantial evidence supported trial court's finding that the plaintiff "was a supervising employee rather than a general contractor"]; see also Bruner & O'Connor, *supra*, § 16:15 [under California law, construction supervisor who is employee of owner is not required to be licensed]; 1 State-by-State Guide to Architect, Engineer, and Contractor Licensing (Walker et al. edits. 1999) § 7.56, p. 250 (Walker).) The brief opinion by the

Attorney General suggests that if the construction manager is an employee, no contractor's license is required and that supervision of construction alone, without having drawn plans and designs, does not require an architect's license. (57 Ops.Cal.Atty.Gen., *supra*, at p. 421; see *Wenke v. Hitchcock* (1972) 6 Cal.3d 746, 751–752 [100 Cal.Rptr. 290, 493 P.2d 1154] [opinion of Attorney General not controlling, although accorded great respect].) Plaintiff does not argue it was IRED's employee but as discussed, *post*, contends it was IRED's partner. In any event, there is no evidence to support the conclusion that IRED and plaintiff were in an employment relationship. (See *Varisco v. Gateway Science & Engineering, Inc.* (2008) 166 Cal.App.4th 1099, 1105 [83 Cal.Rptr.3d 393] [construction inspector not employee]; see also *Fillmore v. Irvine* (1983) 146 Cal.App.3d 649, 658–659 [194 Cal.Rptr. 319] [Lab. Code, § 2750.5, which creates presumption of employment relationship for worker hired to perform contractor work, does not apply in determining whether unlicensed contractor is barred from recovering compensation by § 7031].) The authorities plaintiff relies upon have no application to independent contractors.

### 3. *Section 7026.1 Does Not Limit the Circumstances in Which Consultants to Owner-builders Must Be Licensed*

Plaintiff asserts that, pursuant to section 7026.1, a consultant to an owner-builder must be licensed *only* if it "undertakes, offers to undertake, purports to have the capacity to undertake, or submits a bid, to construct any building . . . , or part thereof." (§ 7026.1, subd. (b).) Plaintiff argues that because it never submitted a bid or undertook to "construct" anything, it was not required to hold a contractor's license.

Section 7026.1, subdivision (b), however, does not designate the "only" circumstance in which a consultant to an owner-builder must hold a contractor's license. Section 7026.1 provides, "The term 'contractor' *includes* all of the following: [¶] . . . [¶] (b) Any person, consultant to an owner-builder, firm, association, organization, partnership, business trust, corporation, or company, who or which undertakes, offers to undertake, purports to have the capacity to undertake, or submits a bid, to construct any building or home improvement project, or part thereof." (Italics added.) The Legislature's use of the term "includes" indicates that the circumstances set forth in section 7026.1 are not intended to be exclusive, but are meant to provide circumstances coming within the broader definition of "contractor" set forth in section 7026—that is, "any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve . . . any building . . . parking facility, . . . excavation or other structure, project, development or improvement, or to do any part

thereof . . . ." Section 7026.1 is not limited to a "consultant to an owner-builder." If it were, and read as plaintiff suggests, the broader definition of "contractor" in section 7026 would be rendered meaningless. Accordingly, I conclude that a nonemployee consultant to an owner-builder must hold a contractor's license if the consultant falls within the definition of "contractor" in section 7026, which includes—but is not limited to—the specific circumstance set forth in section 7026.1, subdivision (b).

### 4. Construction Managers Who Undertake to Provide Contractor Services Must Be Licensed

The Contractors' State License Law does not expressly address the licensing of construction managers on private construction projects.[5] As one authority notes, whether a construction manager must be licensed under California law "depends on how [the construction manager's duties] are defined." (Walker, *supra*, § 7.56, p. 250.) Some duties frequently performed by construction managers fall within the purview of architects or engineers rather than contractors. (See Bruner & O'Connor, *supra*, § 16:15; Walker, supra, § 7.56, pp. 249–250.) The question in this case is whether the particular services plaintiff agreed to provide in the DMA were such that plaintiff was acting in the capacity of a "contractor" as defined by section 7026.

As noted above, section 7026 defines a "contractor" to include a person who "undertakes to or offers to undertake to, or purports to have the capacity to undertake to, . . . by or through others, construct . . . any building." Section 7026.1, subdivision (b), specifies that this definition includes a "consultant to an owner-builder . . . who or which undertakes, offers to undertake, [or] purports to have the capacity to undertake . . . to construct any building . . . ." Section 7057, subdivision (a) defines a general contractor to include a contractor who "superintend[s]" the construction of "any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of at least two unrelated building trades or crafts . . . ."

A construction manager who undertakes on behalf of an owner-builder to perform work within the purview of these provisions—including tasks involving the supervision and coordination of the work of contractors or other licensed construction professionals—is a contractor within the meaning of section 7026. As one commentator has stated, by undertaking duties typically performed by other licensed construction professionals, a construction manager "undertakes to, and purports to have the capacity to undertake to,

---

[5] As discussed, *post*, California law requires licensing of persons providing construction management services with respect to public works projects.

perform construction work, often as a 'consultant to an owner-builder.' " (Acret, California Construction Law Manual, *supra*, § 4:28, p. 286; see also Acret et al., Cal. Construction Contracts, Defects, and Litigation (Cont.Ed.Bar. 2008) § 2.19, p. 95 ["A construction manager must have a contractor's license under Bus & P C §7026.1(b), which defines 'contractor' to include a 'consultant to an owner-builder.' "].)

The analogous decision in *Vallejo Development, supra,* 24 Cal.App.4th 929, supports this application of the Contractors' State License Law. In that case, a real estate developer (VDC) sold six parcels of land zoned for residential use to six "merchant builders." As part of the purchase agreements, VDC agreed to provide the labor and materials required to make certain infrastructure improvements to the land, such as grading and the installation of sewers, required by the City of Vallejo. (24 Cal.App.4th at pp. 935–936.) VDC alleged that it provided such labor and materials through " 'licensed third-party contractors.' " (*Id.* at p. 936.) VDC later sued some of the merchant builders to foreclose on mechanic's liens and for the reasonable value of its services in providing the infrastructure improvements. The trial court concluded that VDC was barred from pursuing its action by section 7031. (24 Cal.App.4th at p. 937.)

The Court of Appeal affirmed. (*Vallejo Development, supra,* 24 Cal.App.4th at p. 947.) The court rejected the argument that VDC was not a "contractor" because it had subcontracted with licensed contractors to provide the labor and materials. (*Id.* at p. 941.) The court observed, "[T]here is no substantive difference between VDC's claim that it merely intended to administer or supervise the work of licensed contractors, and other situations in which unlicensed parties have argued that they should be allowed to recover on their contracts by virtue of their having subcontracted out the work to be performed by licensed contractors. The Legislature's conclusion is precisely the opposite: It is improper for an unlicensed person to develop property for public sale even if licensed contractors work under the unlicensed person." (*Id.* at p. 943.)

Further, requiring licensing of construction managers who undertake to supervise the work of other licensed construction professionals is consistent with the purposes of the Contractors' State License Law. "The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [Citations.] [¶] Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed

contract work. The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay." (*Hydrotech, supra,* 52 Cal.3d at p. 995.) "The protective purposes of the licensing law cannot be satisfied in full measure unless the 'continuing competence and responsibility' of those engaged in the work for which compensation is sought have been officially examined and favorably resolved." (*Id.* at p. 996.)

That these policy considerations apply to construction managers has been recognized by the California Legislature. The Government Code provides that all persons who provide " '[c]onstruction project management' " services on public works projects must be licensed architects, engineers or general contractors (Gov. Code, § 4525, subd. (e)) who have demonstrated "expertise and experience in construction project design review and evaluation, construction mobilization and supervision, bid evaluation, project scheduling, cost-benefit analysis, claims review and negotiation, and general management and administration of a construction project" (Gov. Code, § 4529.5; see generally 78 Ops.Cal.Atty.Gen. 48 (1995) [state and local agencies may not contract with unlicensed construction managers]). Similarly, legislatures in other states have passed licensing requirements for construction managers working in both the public and private sectors.[6] (See generally Bruner & O'Connor, *supra,* § 16:15.) Although California law does not expressly provide that construction managers are included within the definition of "contractor" under section 7026, these other laws evince a recognition that the services performed by construction managers often include those that contractors typically perform.

The fact that the Legislature provided that "construction project management" services on public works projects are those services provided by a "licensed architect, registered engineer, or licensed general contractor" (Gov. Code, § 4525, subd. (e)) does not imply that construction managers on private projects need *not* be licensed contractors. It only means that those who "meet the requirements of Section 4529.5 for management and supervision of work performed on state construction projects" must hold one of those licenses. (Gov. Code, § 4525, subd. (e).) That provision does not purport to define the requirements for a contractor's license, which requirements are set forth in section 7026. Otherwise, a person simply designated as a construction manager on a private project could perform duties of a contractor defined in section 7026, and yet avoid the licensing requirement. To read Government

---

[6] Idaho, for example, has enacted a separate licensing scheme for construction managers who work on public works projects. (Idaho Code Ann. § 54-4503 et seq.) In South Carolina, a construction manager must be a licensed contractor, engineer or architect. (S.C. Code Ann. § 40-11-320.) A Nevada licensing statute expressly includes construction managers in the definition of "contractor." (Nev. Rev. Stat. § 624.020(4).)

Code sections 4525 and 4529.5 as modifying by implication section 7026 of the Business and Professions Code would create an absurd result. (See *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290 [64 Cal.Rptr.3d 661, 165 P.3d 462] [statutes should be interpreted to avoid absurd, impractical or arbitrary results].) Whether a license is required depends on the particular services performed by the construction manager.

The Legislature's enactment of the Construction Management Education Sponsorship Act of 1991 (CMESA; § 7139 et seq.) supports my conclusion that the Contractors' State License Law encompasses construction managers who provide contractor services. In enacting the CMESA, the Legislature found and declared that "[t]here is a demand and increasing need for construction management education programs . . . that prepare graduates for the management of construction operations and companies *regulated by the Contractors' State License Law and enforced by the Contractors' State License Board.*" (§ 7139.1, subd. (a), italics added.) The Legislature further stated, "It is the intent of the Legislature that *by enabling contractors to designate a portion of their licensure fee* and providing a format for *contractors to contribute funds to construction management education,* this article will receive broad based industry support. In addition, this article *allows the contractor to demonstrate the importance of construction management education.* This assistance will enable greater development of construction management curricula and will improve the overall quality of construction *by providing construction management training to California licensed contractors and their current and future management personnel.*" (§ 7139.1, subd. (c), italics added.) The CMESA creates a Construction Management Education Account "as a separate account in the *Contractors' License Fund*" to fund construction management education programs (§ 7139.2, subd. (a), italics added), and requires the Contractors' State License Board to "allow *a contractor* to make a contribution to [that fund] *at the time of the contractor license fee payment.*" (§ 7139.2, subd. (b), italics added.) The program's advisory committee is comprised almost entirely of representatives from professional associations of licensed contractors. (§ 7139.3, subd. (c).) Finally, the Legislature declared its intent that programs under the CMESA are to be funded "only from the Contractors' License Fund . . . ." (§ 7139.10.) The assumption pervading every provision of the CMESA is that it is a program funded by licensed contractors for the purpose of training licensed contractors in construction project management. These provisions suggest that construction managers perform services requiring a contractor's license. (See *Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166] [" '[E]very statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect.' "].)

Plaintiff contracted in the DMA to provide a number of services that fell within the definition of a contractor required to have a license. Plaintiff undertook, for example, to "coordinate and direct" the activities of the architect and engineering design professionals; to provide "opinions or advice on administrative and management matters that relate to the coordination of work among and between the Contractors, Subcontractors, Disbursement Agent, Owner and the Design Professional(s)"; to "coordinate the completion and correction of the work"; and to "assist the Design Professional(s) in conducting substantial final inspections." The coordination of work among various design professionals, contractors and subcontractors is work that is typically performed by a licensed contractor and involves the expertise possessed by a licensed contractor. (See *Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035, 1044 [36 Cal.Rptr.3d 532] [plaintiff was contractor subject to licensing when complaint alleged that plaintiff provided various services on project and the contract specified that the work included drawing plans and "coordination of the architect, electrical engineers, mechanical engineers and structural engineers"].)

Plaintiff also undertook to perform services directly related to the construction process. Plaintiff agreed to obtain building and special permits; to "provide cost and performance evaluations of alternative materials and systems . . ."; to assist the general contractor in "developing bidders' interest in the Project, establish bidding schedules and assist the Owner in preparing construction contract document packages"; to ensure that the general contractor was performing its duties with respect to bids from subcontractors and material suppliers; to conduct daily "on-site inspections and reviews" during construction; and perhaps most significantly, to "use commercially reasonable efforts to achieve satisfactory performance from each of the Contractors and Subcontractors." Plaintiff thus undertook to perform construction services that brought it within the definition of a "contractor" in section 7026.[7]

That IRED also engaged Fullmer to provide general contractor services on the project is of no relevance. Section 7057, subdivision (a) defines a "general building contractor" to be "a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons . . . , requiring in its construction the use of at least two unrelated building trades or crafts, or to do *or superintend the whole or any part thereof.*" (Italics added.) There is no proscription in section 7057 against having multiple parties on a project who

---

[7] That a person performs some services that might be labeled construction management services does not necessarily mean that the person must hold a contractor's license. This case concerns the services specified in the DMA. Also, a person who, as an independent contractor, assists an owner in connection with a construction project does not necessarily require a license. Whether a license is required depends upon the duties that person undertakes to perform.

each perform some general contractor services. For example, here plaintiff did, inter alia, "superintend" a part of the construction project. As explained above, there is a limited variety of tasks to be performed on a construction site; the parties are free to allocate those tasks among the participants in the construction process by private agreement. If a construction manager, as plaintiff, undertakes various contractor services, he or she must have a valid contractor's license, regardless of whether another general contractor has been engaged. Again, whether plaintiff acted in the capacity of a contractor is determined by the services that *plaintiff* undertook to perform.

### C. *Exemptions from the Contractors' State License Law*

Plaintiff argues that, even if the services it provided under the DMA otherwise would require a contractor's license, plaintiff was exempted from that requirement. Plaintiff asserts that (1) because there is no evidence that ground leases held by plaintiff with respect to the Property were terminated as required by the DMA, plaintiff was an owner of the Property and was thus an owner-builder exempt from the licensing requirement under section 7044, subdivision (b); and (2) the DMA created a partnership between plaintiff and Bolotin. Plaintiff, however, did not raise these issues with the trial court in connection with the summary judgment proceeding, and has therefore forfeited them.[8] "It is well established that issues or theories not properly raised or presented in the trial court may not be asserted on appeal, and will not be considered by an appellate tribunal. A party who fails to raise an issue in the trial court has therefore [forfeited] the right to do so on appeal." (*In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 117 [95 Cal.Rptr.2d 113]; see *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [77 Cal.Rptr.3d 695].)

Even had plaintiff raised these issues, the record does not support plaintiff's position. Plaintiff grounds its argument that it was an exempt owner-builder under section 7044, subdivision (b) on the assertion that the DMA states that the ground leases were to terminate by the parties executing certain documents to be attached as exhibits to the DMA. Plaintiff argues that there is no evidence that the termination documents were ever executed, and reasons that there is at least a triable issue whether plaintiff is still an owner of the Property. In contrast, Bolotin argues that the DMA itself provided for the termination of the ground leases, notwithstanding its recitation that formal

---

[8] "Although the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim. In contrast, a waiver is the ' "intentional relinquishment or abandonment of a known right." ' [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 [13 Cal.Rptr.3d 786, 90 P.3d 746].)

termination documents were to be signed. I agree with Bolotin. It was a basic premise of the parties' agreement that plaintiff was to give up its rights (and be relieved of its substantial obligations) under the ground leases. Plaintiff alleged in its first amended complaint that "Plaintiff was required to (and eventually did, in fact) assign the Leases to Defendants." That is an allegation of fact that constitutes a judicial admission. (*Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324 [53 Cal.Rptr.3d 494].) Moreover, plaintiff's principal, Kevin Knox, declared in opposition to the summary judgment motion that the DMA was intended to "cancel all interest in the three ground leases for the Bolotin Property." There is no indication that the parties treated the ground leases as continuing after execution of the DMA.

With respect to plaintiff's partnership argument, the DMA is not reasonably susceptible of the interpretation that the parties intended to create a partnership. (See Corp. Code, § 16101, subd. (9) [partnership is "an association of two or more persons to carry on as coowners [of] a business for profit"]; Corp. Code, § 16202, subd. (a); Rev. & Tax. Code, § 17008 [person is partner who "owns a capital interest in a partnership"]; *Chambers v. Kay* (2002) 29 Cal.4th 142, 151 [126 Cal.Rptr.2d 536, 56 P.3d 645] ["Generally, a partnership connotes co-ownership in partnership property, with a sharing in the profits and losses of a continuing business."].) Although plaintiff's project incentive fee was to be determined as a percentage of the net profits generated by the development, the DMA is unambiguous that the fee was compensation for services.[9] (See Corp. Code, § 16202, subd. (c)(3)(B) [sharing of profits not presumed to be partnership if received "[i]n payment for services as an independent contractor"]; *Spier v. Lang* (1935) 4 Cal.2d 711, 716 [53 P.2d 138] [sharing of profits does not create partnership when "no joint participation in the management and control of the business, and the proposed profit-sharing was contemplated only as compensation . . . ."].)

### D. *Compensation for Some Services Not Requiring a License*

Plaintiff argues that, even if some services under the DMA required it to have a contractor's license, others did not. Plaintiff asserts that it is entitled to compensation for those services for which no license was required. When, as here, however, services are rendered pursuant to a single integrated agreement, section 7031 bars an unlicensed contractor from recovery for any services rendered under that contract, even if no license was required for

---

[9] Plaintiff has not contended that any of the compensation payable under the DMA was for anything other than services performed thereunder, such as for the assignment of the ground leases.

some of the services rendered. (§ 7031, subd. (a) [barring action "for the collection of compensation for the performance of any act *or contract* where a license is required" (italics added)]; *Banis Restaurant Design, Inc. v. Serrano, supra,* 134 Cal.App.4th at p. 1047; see *Vallejo Development, supra,* 24 Cal.App.4th at p. 944; see also *MW Erectors, supra,* 36 Cal.4th at p. 426 [§ 7031 "impose[s] a stiff all-or-nothing penalty for unlicensed work by specifying that a contractor is barred from *all* recovery for such an 'act or contract' if unlicensed *at any time* while performing it"]; *Goldstein v. Barak Construction* (2008) 164 Cal.App.4th 845, 855 [79 Cal.Rptr.3d 603].)

Plaintiff's reliance on *Executive Landscape Corp. v. San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496 [193 Cal.Rptr. 377], for the contrary proposition is misplaced. That case, which arose on demurrer, held that, accepting the plaintiff's allegations as true and drawing all inferences most favorably to the plaintiff, the contract upon which the plaintiff sued could "reasonably be interpreted to require [the plaintiff] to perform work for which no license was required," even though "the form of the contract indicates the likelihood that some, perhaps minimal, services requiring a license may be performed under it." (*Id.* at p. 501.) The court did *not* hold that an unlicensed contractor barred by section 7031 from recovering under a contract for services requiring a license could nevertheless sue to recover partial compensation for other services rendered under the same contract that did not require a license. Such a holding would be inconsistent with the language of section 7031 and the authorities cited above, including the Supreme Court's later decision in *MW Erectors, supra,* 36 Cal.4th 412. Moreover, here, the services for which a license was required were not minimal and cannot effectively be separated from other services for purposes of compensation.[10]

## CONCLUSION

I recognize, as did the Supreme Court in *MW Erectors, supra,* 36 Cal.4th at p. 418, that the Contractors' State License Law "imposes strict and harsh penalties for a contractor's failure to maintain proper licensure." The broad application of the licensing laws are critical to maintain integrity in the building industry. I do not suggest that, aside from not being licensed, plaintiff's conduct was inappropriate. But many incur the burdens to comply with licensing responsibilities. To allow plaintiff to escape those licensing responsibilities is not only poor public policy but unfair to those who comply

---

[10] As noted in footnote 9, *ante,* plaintiff has not suggested part of his compensation could be allocated to something other than services.

with the law. Plaintiff warranted and represented in the DMA that it held "all licenses . . . necessary to perform its duties." Plaintiff failed to take precautions to make sure it held the proper license. As a consequence, it is subject to the "strict and harsh penalties" that result from the judgment. I would affirm the judgment.

Respondents' petition for review by the Supreme Court was denied July 15, 2009, S172699. George, C. J., did not participate therein.